**DAVID M.C. PETERSON**
California State Bar No. 254498
FEDERAL DEFENDERS OF SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, California 92101-5008
Telephone: (619) 234-8467
E-mail: david_peterson@fd.org

Attorneys for Mr. Haynes

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

**(HONORABLE DANA M. SABRAW)**

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 08cr0366-DMS |
| Plaintiff, | Date:    March 28, 2008 |
| | Time:   11:00 a.m. |
| v. | |
| JAMES HAYNES, III, | **STATEMENT OF FACTS AND POINTS AND** |
| | **AUTHORITIES IN SUPPORT OF MOTIONS** |
| Defendant. | |

**I.**

**STATEMENT OF FACTS**[1]

On February 5, 2008, Mr. Haynes was arrested in a maroon Pathfinder by Border Patrol Agents on

State Route 94, in Campo, California. The events leading to the arrest were as follows.

At approximately 8:00 a.m., Border Patrol Agent Jose J. Vasquez, wearing plain clothes, observed

a black male walk towards a Nissan Pathfinder. He observed the black male, later identified by him as Mr.

Haynes, "walk toward" two individuals near the Pathfinder, which was parked in a parking lot several

hundred yards from the United States-Mexico border. Mr. Haynes got into the vehicle and left the parking

lot. Mr. Haynes headed north on Highway 188 toward State Route 94.

---

[1] The following statement of facts is based on the probable cause statement and limited discovery provided by the government. Mr. Haynes in no way admits the truth of these facts nor their accuracy as cited in these motions. Further, he reserves the right to take a position contrary to the following statement of facts at the motions hearing and at trial.

1    Agent Vasquez then approached the two individuals walking south towards Mexico.  As he

2    attempted to approach them, both started to run towards Mexico.  Agent Vasquez apprehended one of them;

3    the other absconded into Mexico.  After identifying himself as a Border Patrol agent, Agent Vasquez

4    questioned the individual, who was later identified as Francisco Nava-Montenegro.  Nava-Montenegro

5    admitted that he was in the United States illegally.

6    Agent Vasquez then instructed Border Patrol Agent Diaz to intercept the Pathfinder and pull it over.

7    Agent Diaz began following Mr. Haynes in an unmarked vehicle.  Border Patrol Agent Robert Godreau also

8    began following Mr. Haynes in an unmarked vehicle.  Agent Diaz informed Border Patrol Agent James

9    Napoli, who was driving a marked Patrol Vehicle, of the Pathfinder's direction.  Mr. Haynes turned onto

10   State Route 94.  After turning onto State Route 94, Agent Napoli stopped the Pathfinder.

11   After the vehicle stop, Agents Napoli, Diaz, and Godreau approached the Pathfinder and identified

12   themselves as Border Patrol Agents.  They questioned Mr. Haynes as to his citizenship.  He stated he was

13   a United States citizen.  Agents Napoli and Diaz later said they had noticed a strong smell of glue coming

14   from the inside of the vehicle.  In addition, they said they heard noises inside the Pathfinder's rear area that

15   "appeared to be" of people moving inside a speaker box.  Agents Diaz, Napoli and Godreau then arrested

16   Mr. Haynes, entered the vehicle and searched the speaker box from the rear seat of the vehicle.  They found

17   five individuals therein, none of whom had permission to be in the United States legally.  Mr. Haynes did

18   not sign a Lujan-Castro waiver authorizing release of the material witnesses; three of the material witnesses

19   found in the car were deported.

20   On February 13, 2008, Mr. Haynes was indicted by a federal grand jury, which charged him with

21   three violations of 8 U.S.C. §§ 1324(a)(1)(A)(ii) and (v)(II), transportation of illegal aliens, and aiding and

22   abetting, and three violations of 8 U.S.C. § 1324(a)(2)(B)(ii), and 18 U.S.C. § 2, aiding and abetting.  He

23   entered a plea of not guilty on all counts.  These motions follow.

24   //

25   //

26   //

27   //

28   //

# II.

## MOTION TO COMPEL DISCOVERY

This request for discovery is not limited to those items that the prosecutor knows of, but rather includes all discovery listed below that is in the custody, control, care, or knowledge of any "closely related investigative [or other] agencies" under United States v. Bryan, 868 F.2d 1032 (9th Cir. 1989):

(1) Mr. Haynes's Statements.  The government must disclose: (a) copies of any written or recorded statements made by Mr. Haynes; (b) copies of any written record containing the substance of any statements made by Mr. Haynes; and (c) the substance of any statements made by Mr. Haynes that the government intends to use, for any purpose, at trial.  See Fed. R. Crim. P. 16(a)(1)(A)-(B).  This request specifically includes a copy of any **audio and video-taped statements** of Mr. Haynes and any rough notes agents took of his statements.

(2) Mr. Haynes's Prior Record.  Mr. Haynes requests disclosure of his prior record.  This includes Mr. Fudge's record of contacts with the United States Border Patrol and/or the Immigration and Naturalization Service, even if those contacts did not result in prosecution.  See Fed. R. Crim. P. 16(a)(1)(D).

(3) Arrest Reports, Notes and Dispatch Tapes.  Mr. Haynes also specifically requests the government to turn over all arrest reports, notes, dispatch or any other tapes that relate to he circumstances surrounding his arrest or any questioning.  This request includes, but it is not limited to, any rough notes, photographs, records, reports, transcripts or other discoverable material.  Fed. R. Crim. P. 16 (a)(1)(A)-(B), (E); Brady v. Maryland, 373 U.S. 83 (1983).  The government must produce arrest reports, investigator's notes, memos from arresting officers, dispatch tapes, sworn statements, and prosecution reports pertaining to the defendant.  Fed. R. Crim. P. 16 (a)(1)(A)-(B), (E); Fed. R. Crim. P. 26.2.  **Specifically, Mr. Haynes requests the dispatch tapes between officers Diaz, Napoli, Godreau, and Vasquez prior to Mr. Haynes arrest.**

(4) Documents and Tangible Objects.  Mr. Haynes requests the opportunity to inspect, copy, and photograph all documents and tangible objects which are material to the defense or intended for use in the government's case-in-chief or were obtained from or belong to him.  See Fed. R. Crim. P. 16(a)(1)(E).

(5)  <u>Reports of Scientific Tests or Examinations</u>.  Mr. Haynes requests the reports of all tests and examinations which are material to the preparation of the defense or are intended for use by the government at trial.  <u>See</u> Fed. R. Crim. P. 16(a)(1)(F).

(6)  <u>Expert Witnesses</u>.  Mr. Haynes requests the name and qualifications of any person that the government intends to call as an expert witness.  <u>See</u> Fed. R. Crim. P. 16(a)(1)(G).  In addition, Mr. Haynes requests written summaries describing the bases and reasons for the expert's opinions.  <u>See</u> <u>id.</u>  We request that the Court order the government to notify the defense as such in a timely manner, so that a proper 104 (<u>Kumho</u>-<u>Daubert</u>) admissibility hearing can be conducted without unduly delaying the trial.

(7)  <u>Brady Material</u>.  Mr. Haynes requests all documents, statements, agents' reports, and tangible evidence favorable to the defendant on the issue of guilt or punishment.  <u>See</u> <u>Brady v. Maryland</u>, 373 U.S. 83 (1963).  This request specifically includes a copy of any **audio and video-taped statement** of material witnesses and any rough notes agents took of their statements.

In addition, impeachment evidence falls within the definition of evidence favorable to the accused, and therefore Mr. Haynes requests disclosure of any impeachment evidence concerning any of the government's potential witnesses, including prior convictions and other evidence of criminal conduct.  <u>See</u> <u>United States v. Bagley</u>, 473 U.S. 667 (1985); <u>United States v. Agurs</u>, 427 U.S. 97 (1976); <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).  This request includes, but is not limited to, any complaints filed (by a member of the public, by another agent, or any other person) against the agent, whether or not the investigating authority has taken any action, as well as any matter for which a disciplinary review was undertaken, whether or not any disciplinary action was ultimately recommended.  In addition, Mr. Haynes requests any evidence tending to show that a prospective government witness: (a) is biased or prejudiced against the defendant; (b) has a motive to falsify or distort his or her testimony; (c) is unable to perceive, remember, communicate, or tell the truth; or (d) has used narcotics or other controlled substances, or has been an alcoholic.

(8)  <u>Request for Preservation of Evidence</u>.  Mr. Haynes specifically requests the preservation of all physical or documentary evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the government and that relate to the arrest or the events leading to the arrest in this case. **Mr. Haynes specifically requests preservation of agent "rough notes," which includes all notes taken**

1  by any and all agents involved in the events leading up to the vehicle stop, the vehicle stop itself, the

2  arrest and processing of Mr. Haynes, whether the notes were written before, during, or after the

3  arrest.

4      (9)  Any Proposed 404(b) Evidence. "[U]pon request of the accused, the prosecution . . . shall

5  provide reasonable notice in advance of trial . . . of the general nature" of any evidence the government

6  proposes to introduce under Rule 404(b).  Fed. R. Evid. 404(b).  Mr. Haynes requests such notice three

7  weeks before trial in order to allow for adequate trial preparation.

8      This includes any "TECS" records (records of prior border crossings) that the Government intends

9  to introduce at trial, whether in its case-in-chief, impeachment, or rebuttal.  Although there is nothing

10  intrinsically improper about prior border crossings, they are nonetheless subject to 404(b), as they are "other

11  acts" evidence that the government must produce before trial.  See United States v. Vega, 188 F.3d 1150,

12  1154-1155 (9th Cir. 1999).  **Specifically, Mr. Haynes requests information including reports of**

13  **investigation, arrest reports, and any other information regarding his alleged previous arrest and**

14  **release on October 26, 2006.  Mr. Haynes further requests any notes or records of any other instances**

15  **in which he was referred to Secondary, particularly on June 12, 2007 and November 29, 2007, which**

16  **appear in current discovery as incidents about which the government has records.**

17      (10)  Witness Addresses.  Mr. Haynes's counsel requests access to the government's witnesses.

18  Thus, counsel requests a witness list and contact phone numbers for each prospective government witness.

19  Counsel also requests the names and contact numbers for witnesses to the crime or crimes charged (or any

20  of the overt acts committed in furtherance thereof) who will not be called as government witnesses.

21  **Particularly, Mr. Haynes requests the full name and last known addresses of all material witnesses,**

22  **including the three percipient witnesses who were released and deported on February 5, 2007.  In**

23  **addition, Mr. Haynes requests the names and addresses of all witnesses the government intends to**

24  **call in any related cases.**

25      (11)  Jencks Act Material.  Mr. Haynes requests production in advance of trial of all material

26  discoverable pursuant to the Jencks Act, 18 U.S.C. § 3500.  Advance production will avoid needless delays

27  at pretrial hearings and at trial.  This request includes any "rough" notes taken by the agents in this case;

28

1    these notes must be produced pursuant to 18 U.S.C. § 3500(e)(1). This request also includes production

2    of transcripts of the testimony of any witness before the grand jury. See 18 U.S.C. § 3500(e)(3).

3         (11a) Original I-213s. Counsel has received some but not all of the typewritten I-213s pertinent to

4    this case. Typically, however, in addition to the typewritten ones, the agents hand-write I-213 and related

5    materials in the field. Later, those notes are typed into the computer. Counsel hereby requests the

6    aforementioned handwritten notes.

7         (12)  Informants and Cooperating Witnesses. Mr. Haynes requests disclosure of the name(s),

8    address(es), and location(s) of all informants or cooperating witnesses used or to be used in this case, and

9    in particular, disclosure of any informant who was a percipient witness in this case or otherwise participated

10   in the crime charged against Mr. Haynes. Roviaro v. United States, 353 U.S. 52, 61-62 (1957). The

11   government must disclose any information derived from informants which exculpates or tends to exculpate

12   Mr. Haynes. Brady v. Maryland, 373 U.S. 83 (1963). The government must disclose any information

13   indicating bias on the part of any informant or cooperating witness. Id. **Specifically, Mr. Haynes requests**

14   **disclosure of the names of any witnesses in related cases who may be cooperating with the**

15   **government or providing information that the government is using in its case against Mr. Haynes,**

16   **as well as any information indicating bias on the part of any witnesses or potential witnesses against**

17   **him.**

18        (13)  Residual Request. Mr. Haynes intends by this discovery motion to invoke his rights to

19   discovery to the fullest extent possible under the Federal Rules of Criminal Procedure and the Constitution

20   and laws of the United States.

21                                                    **III.**

22              **THIS COURT SHOULD ORDER PRESERVATION OF EVIDENCE**

23        Mr. Haynes requests the preservation of all physical evidence in this case. This includes any

24   evidence that may be destroyed, lost, or otherwise put out of the possession, custody, or care of the

25   government (or its private contractors) in this case. United States v. Riley, 189 F.3d 802, 806-808

26   (9th Cir.1999). This request includes, but is not limited to: (1) the results of any fingerprint analysis; (2)

27   Mr. Haynes' personal effects; **(3) the agents' rough notes**; **(4) any radio broadcast, if it is recorded;** (5)

28   any videotape taken of Mr. Haynes, or anyone else involved in this case, including deported material

witnesses; (6) any evidence seized from the defendant or any third party (i.e., material witnesses, co-defendants); and (7) the vehicle in this case. This request also includes any material or percipient witnesses who might be deported or otherwise likely to become unavailable (e.g. undocumented aliens and transients). Defendant requests that government counsel be ordered to notify the agencies and private contractors with custody of such evidence of the Court's preservation order.

**IV.**

### THE INDICTMENT SHOULD BE DISMISSED BECAUSE JUDGE BURNS' INSTRUCTIONS AS A WHOLE PROVIDED TO THE JANUARY 2007 GRAND JURY RUN AFOUL OF BOTH *NAVARRO-VARGAS* AND *WILLIAMS* AND VIOLATE THE FIFTH AMENDMENT BY DEPRIVING MR. HAYNES OF THE TRADITIONAL FUNCTIONING OF THE GRAND JURY

**A.    Introduction.**

The indictment in the instant case was returned by the January 2007 grand jury. See Clerk's Record at 6. That grand jury was instructed by Judge Burns on January 11, 2007. See Reporter's Partial Transcript of the Proceedings, dated January 11, 2007 (Exhibit A hereto). Judge Burns' instructions to the impaneled grand jury deviate from the instructions at issue in the major Ninth Circuit cases challenging a form grand jury instruction previously given in this district in several ways.[2] These instructions compounded Judge Burns' erroneous instructions and comments to prospective grand jurors during voir dire of the grand jury panel, which immediately preceded the instructions at Ex. A. See Reporter's Transcript of Proceedings, dated January 11, 2007 (Exhibit B hereto).

**1.    Judge Burns Instructed Grand Jurors That Their Singular Duty Is to Determine Whether or Not Probable Cause Exists and That They Have No Right to Decline to Indict When the Probable Cause Standard Is Satisfied**

After repeatedly emphasizing to the grand jurors that probable cause determination was their sole responsibility, see Exh. A at 3, 3-4, 5,[3] Judge Burns instructed the grand jurors that they were forbidden "from judg[ing] the wisdom of the criminal laws enacted by Congress; that is, whether or not there should

---

[2] See e.g., United States v. Cortez-Rivera, 454 F.3d 1038 (9th Cir. 2006); United States v. Navarro-Vargas, 408 F.3d 1184 (9th Cir.) (en banc), cert. denied, 126 S. Ct. 736 (2005) (Navarro-Vargas II); United States v. Navarro-Vargas, 367 F.3d 896 (9th Cir. 2004)(Navarro-Vargas I); United States v. Marcucci, 299 F.3d 1156 (9th Cir. 2002) (per curiam).

[3] See also id. at 20 ("You're all about probable cause.").

be a federal law or should not be a federal law designating certain activity [as] criminal is not up to you." See id. at 8. The instructions go beyond that, however, and tell the grand jurors that, should "you disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient' or 'I'm going to vote in favor of even though the evidence may be insufficient.'" See id. at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because the grand jurors disagree with a proposed prosecution.

Immediately before limiting the grand jurors' powers in the way just described, Judge Burns referred to an instance in the grand juror selection process in which it excused three potential jurors. See id. at 8.

> I've gone over this with a couple of people. You understood from the questions and answers that a couple of people were excused, I think three in this case, because they could not adhere to the principle that I'm about to tell you.

Id. That "principle" was Judge Burns' discussion of the grand jurors' inability to give effect to their disagreement with Congress. See id. at 8-9. Thus, Judge Burns not only instructed the grand jurors on its view of their discretion; it enforced that view on pain of being excused from service as a grand juror.

Examination of the recently disclosed voir dire transcript, which contains additional instructions and commentary in the form of the give and take between Judge Burns and various prospective grand jurors, reveals how Judge Burns' emphasis of the singular duty is to determine whether or not probable cause exists and its statement that grand jurors they cannot judge the wisdom of the criminal laws enacted by Congress merely compounded an erroneous series of instructions already given to the grand jury venire. In one of its earliest substantive remarks, Judge Burns makes clear that the grand jury's sole function is probable cause determination.

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. In this passage, Judge Burns twice uses the term "should" in a context makes clear that the term is employed to convey instruction: "should" cannot reasonably be read to mean optional when it addresses the obligation not to indict when the grand jury has no "reasonable belief that a crime was

1    committed" or if it has no "reasonable belief that the person that they propose that we indict committed the

2    crime."

3         Equally revealing are Judge Burns' interactions with two potential grand jurors who indicated that,

4    in some unknown set of circumstances, they might decline to indict even where there was probable cause.

5    Because of the redactions of the grand jurors' names, Mr. Haynes will refer to them by occupation.  One

6    is a retired clinical social worker (hereinafter CSW), and the other is a real estate agent (hereinafter REA).

7    The CSW indicated a view that no drugs should be considered illegal and that some drug prosecutions were

8    not an effective use of resources.  <u>See id.</u> at 16.  The CSW was also troubled by certain unspecified

9    immigration cases.  <u>See id.</u>

10        Judge Burns made no effort to determine what sorts of drug and immigration cases troubled the

11   CSW.  It never inquired as to whether the CSW was at all troubled by the sorts of cases actually filed in this

12   district, such as drug smuggling cases and cases involving reentry after deportation and alien smuggling.

13   Rather, it provided instructions suggesting that, in any event, any scruples CSW may have possessed were

14   simply not capable of expression in the context of grand jury service.

15       Now, the question is can you fairly evaluate [drug cases and immigration cases]?  Just as the
         defendant is ultimately entitled to a fair trial and the person that's accused is entitled to a fair

16       appraisal of the evidence of the case that's in front of you, so, too, is the United States entitled
         to a fair judgment.  If there's probable cause, then the case should go forward.  *I wouldn't want*

17       *you to say,* "well, yeah, there's probable cause, but I still don't like what our government is
         doing.  I disagree with these laws, so I'm not going to vote for it to go forward."  If that is your

18       frame of mind, the probably you shouldn't serve.  Only you can tell me that.

19   <u>See id.</u> at 16-17 (emphasis added).  Thus, without any sort of context whatsoever, Judge Burns let the grand

20   juror know that it would not want him or her to decline to indict in an individual case where the grand juror

21   "[didn't] like what our government is doing," <u>see id.</u> at 17, but in which there was probable cause.  <u>See Id.</u>

22   Such a case "should go forward."  <u>See id.</u>  Given that blanket proscription on grand juror discretion, made

23   manifest by Judge Burns' use of the pronoun "I", the CSW indicated that it "would be difficult to support

24   a charge even if [the CSW] thought the evidence warranted it."  <u>See id.</u>  Again, Judge Burns' question

25   provided no context; Judge Burns inquired regarding "a case," a term presumably just as applicable to

26   possession of a small amount of medical marijuana as kilogram quantities of methamphetamine for

27   distribution.  Any grand juror listening to this exchange could only conclude that there was *no* case in which

28   Judge Burns would permit them to vote "no bill" in the face of a showing probable cause.

Just in case there may have been a grand juror that did not understand his or her inability to exercise anything like prosecutorial discretion, Judge Burns drove the point home in its exchange with REA. REA first advised Judge Burns of a concern regarding the "disparity between state and federal law" regarding "medical marijuana." See id. at 24. Judge Burns first sought to address REA's concerns about medical marijuana by stating that grand jurors, like trial jurors, are simply forbidden from taking penalty considerations into account.

> Well, those things -- the consequences of your determination shouldn't concern you in the sense that penalties or punishment, things like that -- we tell trial jurors, of course, that they cannot consider the punishment or the consequence that Congress has set for these things. We'd ask you to also abide by that. We want you to make a business-like decision of whether there was a probable cause. . . .

Id. at 24-25. Having stated that REA was to "abide" by the instruction given to trial jurors, Judge Burns went on to suggest that REA recuse him or herself from medical marijuana cases. See id. at 25.

In response to further questioning, REA disclosed REA's belief "that drugs should be legal." See id. That disclosure prompted Judge Burns to begin a discussion that ultimately led to an instruction that a grand juror is obligated to vote to indict if there is probable cause.

> I can tell you sometimes I don't agree with some of the legal decisions that are indicated that I have to make. But my alternative is to vote for someone different, vote for someone that supports the policies I support and get the law changed. It's not for me to say, "well, I don't like it. So I'm not going to follow it here."
>
> You'd have a similar obligation as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.
>
> That's not what your prerogative is here. You're prerogative instead is to act like a judge and say, "all right. This is what I've to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). Thus, the grand juror's duty is to conduct a simple two part test, which, if both questions are answered in the affirmative, lead to an "obligation" to indict.

Having set forth the duty to indict, and being advised that REA was "uncomfortable" with that paradigm, Judge Burns then set about to ensure that there was no chance of a deviation from the obligation to indict in every case in which there was probable cause.

The Court: Do you think you'd be inclined to let people go in drug cases even though you were convinced there was probable cause they committed a drug offense?
REA: It would depend on the case.
The Court: Is there a chance that you would do that?
REA: Yes.
The Court: I appreciate your answers.  I'll excuse you at this time.

Id. at 27.  Two aspects of this exchange are crucial.  First, REA plainly does not intend to act solely on his political belief in decriminalization -- whether he or she would indict "depend[s] on the case," see id., as it should.  Because REA's vote "depend[s] on the case," see id., it is necessarily true that REA would vote to indict in some (perhaps many or even nearly all) cases in which there was probable cause.  Again, Judge Burns made no effort to explore REA's views; it did not ascertain what sorts of cases would prompt REA to hesitate.  The message is clear: it does not matter what type of case might prompt REA's reluctance to indict because, once the two part test is satisfied, the "obligation" is "to vote in favor of the case going forward."[4]  See id. at 27.  That is why even the "chance," see id., that a grand juror might not vote to indict was too great a risk to run.

**2.      The Instructions Posit a Non-Existent Prosecutorial Duty to Offer Exculpatory Evidence.**

In addition to its instructions on the authority to choose not to indict, Judge Burns also assured the grand jurors that prosecutors would present to them evidence that tended to undercut probable cause.  See Ex. A at 20.[5]

_____

[4] This point is underscored by Judge Burns' explanation to the Grand Jury that a magistrate judge will have determined the existence of probable cause "in most circumstances" before it has been presented with any evidence.  See Ex. A at 6.  This instruction created an imprimatur of finding probable cause in each case because had a magistrate judge not so found, the case likely would not have been presented to the Grand Jury for indictment at all.  The Grand Jury was informed that it merely was redundant to the magistrate court "in most circumstances."  See id.  This instruction made the grand jury more inclined to indict irrespective of the evidence presented.

[5] These instructions were provided in the midst of several comments that praised the United States attorney's office and prosecutors in general.  Judge Burns advised the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of [them] will be candid, they'll be honest, and . . . they'll act in good faith in all matters presented to you."  See Ex. A at 27.  The instructions delivered during voir dire go even further.  In addressing a prospective grand juror who revealed "a strong bias for the U.S. Attorney, whatever cases they might bring," see Ex. B at 38, Judge Burns affirmatively endorsed the prospective juror's view of the U.S. Attorney's office, even while purporting to discourage it: "frankly, I agree with the things

Now, again, this emphasizes the difference between the function of the grand jury and the trial jury. You're all about probable cause. If you think that there's evidence out there that might cause you to say "well, I don't think probable cause exists," then it's incumbent upon you to hear that evidence as well. As I told you, in most instances, *the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence.*

Id. (emphasis added).

The antecedent to this instruction is also found in the voir dire. After advising the grand jurors that "the presentation of evidence to the grand jury is necessarily one-sided," see Ex. B at 14, Judge Burns gratuitously added that "[his] experience is that the prosecutors don't play hide-the-ball. If there's something adverse or that cuts against the charge, you'll be informed of that. They have a duty to do that." See id. Thus, Judge Burns unequivocally advised the grand jurors that the government would present any evidence that was "adverse" or "that cuts against the charge." See id.

**B.     *Navarro-Vargas* Establishes Limits on the Ability of Judges to Constrain the Powers of the Grand Jury, Which Judge Burns Far Exceeded in Its Instructions as a Whole During Impanelment.**

The Ninth Circuit has, over vigorous dissents, rejected challenges to various instructions given to grand jurors in the Southern District of California. See Navarro-Vargas II, 408 F.3d 1184. While the Ninth Circuit has thus far (narrowly) rejected such challenges, it has, in the course of adopting a highly formalistic

---

you are saying. They make sense to me." See id. at 43. See also id. at 40 ("You were saying that you give a presumption of good faith to the U.S. Attorney and assume, quite logically, that they're not about the business of trying to indict innocent people or people that they believe to be innocent or the evidence doesn't substantiate the charges against.").

Judge Burns' discussion of once having been a prosecutor before the Grand Jury compounded the error inherent of praising the government attorneys. See Ex. A at 9-10. Judge Burns' instructions implied that as a prior prosecutor and current "jury liaison judge," see id. at 8, it would not allow the government attorneys to act inappropriately or to present cases for indictment where no probable cause existed.

In addition, while Judge Burns instructed the Grand Jury that it had the power to question witnesses, Judge Burns' instructions also told the Grand Jury that it should "be deferential to the U.S. Attorney if there is an instance where the U.S. Attorney thinks a question ought not to be asked." See Ex. A at 12. As the dissent in Navarro-Vargas pointed out, "the grand jury's independence is diluted by [such an] instruction, which encourages deference to prosecutors." Navarro-Vargas, 408 F.3d at 1215. The judge's admonition that his statement was only "advice," see Ex A at 12, does not cure the error as courts regularly presume grand jurors follow instructions provided to them by the court. See id. at 1202, n.23 ("We must presume that grand jurors will follow instructions because, in fact, we are prohibited from examining jurors to verify whether they understood the instruction as given and then followed it.").

approach[6] to the problems posed by the instructions, endorsed many of the substantive arguments raised by the defendants in those cases. The district court's instructions cannot be reconciled with the role of the grand jury as set forth in Navarro-Vargas II. Taken together, the voir dire of and instructions given to the January 2007 Grand Jury, go far beyond those at issue in Navarro-Vargas, taking a giant leap in the direction of a bureaucratic, deferential grand jury, focused solely upon probable cause determinations and utterly unable to exercise any quasi-prosecutorial discretion. That is not the institution the Framers envisioned. See United States v. Williams, 504 U.S. 36, 49 (1992).

For instance, with respect to the grand jury's relationship with the prosecution, the Navarro-Vargas II majority acknowledges that the two institutions perform similar functions: "'the public prosecutor, in deciding whether a particular prosecution shall be instituted or followed up, performs much the same function as a grand jury.'" Navarro-Vargas II, 408 F.3d at 1200 (quoting Butz v. Economou, 438 U.S. 478, 510 (1978)). Accord United States v. Navarro-Vargas, 367 F.3d 896, 900 (9th Cir. 2004) (Navarro-Vargas I)(Kozinski, J., dissenting) (The grand jury's discretion in this regard "is most accurately described as prosecutorial." ). See also Navarro-Vargas II, 408 F.3d at 1213 (Hawkins, J., dissenting). It recognizes that the prosecutor is not obligated to proceed on any indictment or presentment returned by a grand jury, id., but also that "the grand jury has no obligation to prepare a presentment or to return an indictment drafted by the prosecutor." Id. See Niki Kuckes, The Democratic Prosecutor: Explaining the Constitutional Function of the Federal Grand Jury, 94 Geo. L.J. 1265, 1302 (2006) (the grand jury's discretion not to indict was "'arguably . . . the most important attribute of grand jury review from the perspective of those who insisted that a grand jury clause be included in the Bill of Rights'") (quoting Wayne LaFave et al., Criminal Procedure § 15.2(g) (2d ed. 1999)).

Indeed, the Navarro-Vargas II majority agrees that the grand jury possesses all the attributes set forth in Vasquez v. Hillery, 474 U.S. 254 (1986). See id.

> The grand jury thus determines not only whether probable cause exists, but also whether to "charge a greater offense or a lesser offense; numerous counts or a single count; and perhaps most significant of all, a capital offense or a non-capital offense -- all on the basis of the same

---

[6] See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (criticizing the majority because "[t]he instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence.").

1    facts. And, significantly, the grand jury may refuse to return an indictment even "'where a
2    conviction can be obtained.'"

3    Id. (quoting Vasquez, 474 U.S. at 263). The Supreme Court has itself reaffirmed Vasquez's description of

4    the grand jury's attributes in Campbell v. Louisiana, 523 U.S. 392 (1998), noting that the grand jury

5    "controls not only the initial decision to indict, but also significant questions such as how many counts to

6    charge and whether to charge a greater or lesser offense, including the important decision whether to charge

7    a capital crime." Id. at 399 (citing Vasquez, 474 U.S. at 263). Judge Hawkins notes that the Navarro-

8    Vargas II majority accepts the major premise of Vasquez: "the majority agrees that a grand jury has the

9    power to refuse to indict someone even when the prosecutor has established probable cause that this

10   individual has committed a crime." See id. at 1214 (Hawkins, J. dissenting). Accord Navarro-Vargas I,

11   367 F.3d at 899 (Kozinski, J., dissenting); United States v. Marcucci, 299 F.3d 1156, 1166-73 (9th Cir.

12   2002) (per curiam) (Hawkins, J., dissenting). In short, the grand jurors' prerogative not to indict enjoys

13   strong support in the Ninth Circuit. But not in Judge Burns' instructions.

14   **C.    Judge Burns' Instructions Forbid the Exercise of Grand Jury Discretion Established in
         Both *Vasquez* and *Navarro-Vargas II*.**

15

16       The Navarro-Vargas II majority found that the instruction in that case "leave[s] room for the grand

17   jury to dismiss even if it finds probable cause," 408 F.3d at 1205, adopting the analysis in its previous

18   decision in Marcucci. Marcucci reasoned that the instructions do not mandate that grand jurors indict upon

19   every finding of probable cause because the term "should" may mean "what is probable or expected." 299

20   F.3d at 1164 (citation omitted). That reading of the term "should" makes no sense in context, as Judge

21   Hawkins ably pointed out. See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) ("The

22   instruction's use of the word 'should' is most likely to be understood as imposing an inflexible 'duty or

23   obligation' on grand jurors, and thus to circumscribe the grand jury's constitutional independence."). See

24   also id. ("The 'word' should is used to express a duty [or] obligation.") (quoting The Oxford American

25   Diction and Language Guide 1579 (1999) (brackets in original)).

26       The debate about what the word "should" means is irrelevant here; the instructions here make no

27   such fine distinction. The grand jury instructions make it painfully clear that grand jurors simply may not

28   choose not to indict in the event of what appears to them to be an unfair application of the law: should "you

disagree with that judgment made by Congress, then your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient'...." See Ex. A at 8-9. Thus, the instruction flatly bars the grand jury from declining to indict because they disagree with a proposed prosecution. No grand juror would read this language as instructing, or even allowing, him or her to assess "the need to indict." Vasquez, 474 U.S. at 264.

While Judge Burns used the word "should" instead of "shall" during voir dire with respect to whether an indictment was required if probable cause existed, see Ex. B at 4, 8, n context, it is clear that it could only mean "should" in the obligatory sense. For example, when addressing a prospective juror, Judge Burns not only told the jurors that they "should" indict if there is probable cause, it told them that if there is not probable cause, "then the grand jury should hesitate and not indict." See id. at 8. At least in context, it would strain credulity to suggest that Judge Burns was using "should" for the purpose of "leaving room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205. Clearly it was not.

The full passage cited above effectively eliminates any possibility that Judge Burns intended the Navarro-Vargas spin on the word "should."

> [T]he grand jury is determining really two factors: "do we have a reasonable belief that a crime was committed? And second, do we have a reasonable belief that the person that they propose that we indict committed the crime?"
>
> If the answer is "yes" to both of those, then the case should move forward. If the answer is to either of the questions is "no," then the grand jury should not hesitate and not indict.

See Ex. B at 8. Of the two sentences containing the word "should," the latter of the two essentially states that if there is no probable cause, you *should* not indict. Judge Burns could not possibly have intended to "leav[e] room for the grand jury to [indict] even if it finds [no] probable cause." See Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159). That would contravene the grand jury's historic role of protecting the innocent. See, e.g., United States v. Calandra, 414 U.S. 338, 343 (1974) (The grand jury's "responsibilities continue to include both the determination whether there is probable cause and the protection of citizens against unfounded criminal prosecutions.") (citation omitted).

By the same token, if Judge Burns said that "the case should move forward" if there is probable cause, but intended to "leav[e] room for the grand jury to dismiss even if it finds probable cause," see

1   Navarro-Vargas, 408 F.3d at 1205 (citing Marcucci, 299 F.3d at 1159), then it would have to have intended

2   two different meanings of the word "should" in the space of two consecutive sentences.  That could not

3   have been its intent.  But even if it were, no grand jury could ever have had that understanding.[7]  Jurors are

4   not presumed to be capable of sorting through internally contradictory instructions.  See generally United

5   States v. Lewis, 67 F.3d 225, 234 (9th Cir. 1995) ("where two instructions conflict, a reviewing court

6   cannot presume that the jury followed the correct one") (citation, internal quotations and brackets omitted).

7       Lest there be any room for ambiguity, on no less than four occasions, Judge Burns made it explicitly

8   clear to the grand jurors that "should" was not merely suggestive, but obligatory:

9       **(1)**    The first occasion occurred in the following exchange when Judge Burns conducted voir dire

10   and excused a potential juror (CSW):

> The Court: . . . If there's probable cause, then the case should go forward.  I wouldn't want you
> to say, "Well, yeah, there's probable cause.  But I still don't like what the government is doing.
> I disagree with these laws, so I'm not going to vote for it to go forward."  If that's your frame
> of mind, then probably you shouldn't serve.  Only you can tell me that.
> Prospective Juror: Well, I think I may fall in that category.
> The Court: In the latter category?
> Prospective Juror: Yes.
> The Court: Where it would be difficult for you to support a charge even if you thought the
> evidence warranted it?
> Prospective Juror: Yes.
> The Court: I'm going to excuse you then.

17   See Ex. B at 17.  There was nothing ambiguous about the word "should" in this exchange with a prospective

18   juror.  Even if the prospective juror did not like what the government was doing in a particular case, that

19   case "should go forward" and Judge Burns expressly disapproved of any vote that might prevent that.  See

20   id. ("I wouldn't want you [to vote against such a case]").  The sanction for the possibility of independent

21   judgment was dismissal, a result that provided full deterrence of that juror's discretion and secondary

22   deterrence as to the exercise of discretion by any other prospective grand juror.

23       **(2)**    In an even more explicit example of what "should" meant, Judge Burns makes clear that it

24   there is an unbending obligation to indict if there is probable cause.  Grand jurors have no other prerogative.

---

26   [7]  This argument does not turn on Mr. Haynes' view that the Navarro-Vargas/Marcucci reading of the
27   word "should" in the model instructions is wildly implausible.  Rather, it turns on the context in which the
     word is employed by Judge Burns in his unique instructions, context which eliminates the Navarro-
28   Vargas/Marcucci reading as a possibility.

The Court: . . . It's not for me to say, "Well, I don't like it. So I'm not going to follow it here."

You'd have a similar *obligation* as a grand juror even though you might have to grit your teeth on some cases. Philosophically, if you were a member of Congress, you'd vote against, for example, criminalizing marijuana. I don't know if that's it, but you'd vote against criminalizing some drugs.

That's not what your *prerogative* is here. Your prerogative instead is act like a judge and to say, "All right. This is what I've got to deal with objectively. Does it seem to me that a crime was committed? Yes. Does it seem to me that this person's involved? It does." *And then your obligation, if you find those things to be true, would be to vote in favor of the case going forward.*

Id. at 26-27 (emphasis added). After telling this potential juror (REA) what his obligations and prerogatives were, the Court inquired as to whether "you'd be inclined to let people go on drug cases even though you were convinced there was probable cause they committed a drug offense?" Id. at 27. The potential juror responded: "It would depend on the case." Id. Nevertheless, that juror was excused. Id. at 28. Again, in this context, and contrary to the situation in Navarro-Vargas, "should" means "shall"; it is obligatory, and the juror has no prerogative to do anything other than indict if there is probable cause.

Moreover, as this example demonstrates, the issue is not limited to whether the grand jury believes a particular law to be "unwise." This juror said that any decision to indict would not depend on the law, but rather it would "depend on the case." Thus, it is clear that Judge Burns' point was that if a juror could not indict on probable cause for *every* case, then that juror was not fit for service. It is equally clear that the prospective juror did not dispute the "wisdom of the law;" he was prepared to indict under some factual scenarios, perhaps many. But Judge Burns did not pursue the question of what factual scenarios troubled the prospective jurors, because its message is that there is no discretion not to indict.

(**3**)    As if the preceding examples were not enough, Judge Burns continued to pound the point home that "should" meant "shall" when it told another grand juror during voir dire: "[W]hat I have to insist on is that you follow the law that's given to us by the United States Congress. We enforce the federal laws here." See id. at 61.

(**4**)    And then again, after swearing in all the grand jurors who had already agreed to indict in every case where there was probable cause, Judge Burns reiterated that "should" means "shall" when it reminded them that "your option is not to say 'well, I'm going to vote against indicting even though I think that the evidence is sufficient . . . . Instead your *obligation* is . . . not to bring your personal definition of

1    what the law ought to be and try to impose that through applying it in a grand jury setting." See Ex. A at

2    9.

3           Moreover, Judge Burns advised the grand jurors that the were forbidden from considering the

4    penalties to which indicted persons may be subject.

5           Prospective Juror (REA): ... And as far as being fair, it kind of depends on what the case is
            about because there is a disparity between state and federal law.
6           The Court:  In what regard?
            Prospective Juror: Specifically, medical marijuana.
7           The Court:  Well, those things -- the consequences of your determination shouldn't concern
            you in the sense that penalties or punishment, things like that -- *we tell trial jurors, of course,*
8           *that they cannot consider the punishment or the consequence that Congress has set for these*
            *things.  We'd ask you to also abide by that.*  We want you to make a business-like decision
9           of whether there was a probable cause. ...

10   See Ex. B at 24-25 (emphasis added).  A "business-like decision of whether there was a probable cause"

11   would obviously leave no role for the consideration of penalty information.

12          The Ninth Circuit previously rejected a claim based upon the proscription against consideration of

13   penalty information based upon the same unlikely reading of the word "should" employed in Marcucci.  See

14   United States v. Cortez-Rivera, 454 F.3d 1038, 1040-41 (9th Cir. 2006).  Cortez-Rivera is inapposite for

15   two reasons.  First, Judge Burns did not use the term "should" in the passage quoted above.  Second, that

16   context, as well as its consistent use of a mandatory meaning in employing the term, eliminate the

17   ambiguity (if there ever was any) relied upon by Cortez-Rivera.  The instructions again violate Vasquez,

18   which plainly authorized consideration of penalty information.  See 474 U.S. at 263.

19          Noting can mask the undeniable fact that Judge Burns explicitly instructed the jurors time and time

20   again that they had a duty, an obligation, and a singular prerogative to indict each and every case where

21   there was probable cause.  These instructions go far beyond the holding of Navarro-Vargas and stand in

22   direct contradiction of the Supreme Court's decision in Vasquez.  Indeed, it defies credulity to suggest that

23   a grand juror hearing these instructions, and that voir dire, could possibly believe what the Supreme Court

24   held in Vasquez:

25          The grand jury does not determine only that probable cause exists to believe that a defendant
            committed a crime, or that it does not.  In the hands of the grand jury lies the power to charge
26          a greater offense or a lesser offense; numerous counts or a single count; and perhaps most
            significant of all, a capital offense or a non-capital offense – all on the basis of the same facts.
27          Moreover, "[t]he grand jury is not bound to indict in every case where a conviction can be
            obtained."

28

1   474 U.S. at 263 (quoting <u>United States v. Ciambrone</u>, 601 F.2d 616, 629 (2nd Cir. 1979) (Friendly, J.,

2   dissenting)); <u>accord</u> <u>Campbell v. Louisiana</u>, 523 U.S. 392, 399 (1998) (The grand jury "controls not only

3   the initial decision to indict, but also significant decisions such as how many counts to charge and whether

4   to charge a greater or lesser offense, including the important decision whether to charge a capital crime.").

5   Nor would the January 2007 grand jury ever believe that it was empowered to assess the "the need to

6   indict." <u>See</u> <u>id.</u> at 264.  Judge Burns' grand jury is not <u>Vasquez</u>'s grand jury.  The instructions therefore

7   represent structural constitutional error "that interferes with the grand jury's independence and the integrity

8   of the grand jury proceeding."  <u>See</u> <u>United States v. Isgro</u>, 974 F.2d 1091, 1094 (9th Cir. 1992).  The

9   indictment must therefore be dismissed.  <u>Id.</u>

10      The <u>Navarro-Vargas II</u> majority's faith in the structure of the grand jury *is not* a cure for the

11  instructions excesses.  The <u>Navarro-Vargas II</u> majority attributes "[t]he grand jury's discretion -- its

12  independence -- [to] the absolute secrecy of its deliberations and vote and the unreviewability of its

13  decisions." 408 F.3d at 1200.  As a result, the majority discounts the effect that a judge's instructions may

14  have on a grand jury because "it is the *structure* of the grand jury process and its *function* that make it

15  independent." <u>Id.</u> at 1202 (emphases in the original).

16      Judge Hawkins sharply criticized this approach.  The majority, he explains, "believes that the

17  'structure' and 'function' of the grand jury -- particularly the secrecy of the proceedings and unreviewability

18  of many of its decisions -- sufficiently protects that power."  <u>See</u> <u>id.</u> at 1214 (Hawkins, J., dissenting).  The

19  flaw in the majority's analysis is that "[i]nstructing a grand jury that it lacks power to do anything beyond

20  making a probable cause determination ... unconstitutionally undermines the very structural protections that

21  the majority believes save[] the instruction." <u>Id.</u>  After all, it is an "'almost invariable assumption of the law

22  that jurors follow their instructions.'"  <u>Id.</u> (quoting <u>Richardson v. Marsh</u>, 481 U.S. 200, 206 (1987)).  If that

23  "invariable assumption" were to hold true, then the grand jurors could not possibly fulfill the role described

24  in <u>Vasquez</u>.  Indeed, "there is something supremely cynical about saying that it is fine to give jurors

25  erroneous instructions because nothing will happen if they disobey them." <u>Id.</u>

26      In setting forth Judge Hawkins' views, Mr. Haynes understands that this Court may not adopt them

27  solely because the reasoning that supports them is so much more persuasive than the majority's sophistry.

28  Rather, he sets them forth to urge the Court *not to extend* what is already untenable reasoning.

Here, again, the question is not an obscure interpretation of the word "should", especially in light of the instructions and commentary by Judge Burns during voir dire discussed above - unaccounted for by the Court in Navarro-Vargas II because they had not yet been disclosed to the defense, but an absolute ban on the right to refuse to indict that directly conflicts with the recognition of that right in Vasquez, Campbell, and both Navarro-Vargas II opinions.  Navarro-Vargas II is distinguishable on that basis, but not only that.

Judge Burns did not limit himself to denying the grand jurors the power that Vasquez plainly states they enjoy.  It also excused prospective grand jurors who might have exercised that Fifth Amendment prerogative, excusing "three [jurors] in this case, because they could not adhere to [that] principle...." See Ex. A at 8; Ex. B at 17, 28.  The structure of the grand jury and the secrecy of its deliberations cannot embolden grand jurors who are no longer there, likely because they expressed their willingness to act as the conscience of the community.  See Navarro-Vargas II, 408 F.3d at 1210-11 (Hawkins, J., dissenting) (a grand jury exercising its powers under Vasquez "serves ... to protect the accused from the other branches of government by acting as the 'conscience of the community.'") (quoting Gaither v. United States, 413 F.2d 1061, 1066 & n.6 (D.C. Cir. 1969)).  The federal courts possess only "very limited" power "to fashion, on their own initiative, rules of grand jury procedure," United States v. Williams, 504 U.S. 36, 50 (1992), and, here, Judge Burns has both fashioned its own rules and enforced them.

**D.    The Instructions Conflict with *Williams'* Holding That There Is No Duty to Present Exculpatory Evidence to the Grand Jury.**

In Williams, the defendant, although conceding that it was not required by the Fifth Amendment, argued that the federal courts should exercise their supervisory power to order prosecutors to disclose exculpatory evidence to grand jurors, or, perhaps, to find such disclosure required by Fifth Amendment common law.  See 504 U.S. at 45, 51.  Williams held that "as a general matter at least, no such 'supervisory' judicial authority exists."  See id. at 47.  Indeed, although the supervisory power may provide the authority "to dismiss an indictment because of misconduct before the grand jury, at least where that misconduct amounts to a violation of one of those 'few, clear rules which were carefully drafted and approved by this Court and by Congress to ensure the integrity of the grand jury's functions,'" id. at 46 (citation omitted), it does not serve as "a means of *prescribing* such standards of prosecutorial conduct in the first instance."  Id. at 47 (emphasis added).  The federal courts possess only "very limited" power "to fashion, on their own

1  initiative, rules of grand jury procedure." <u>Id.</u> at 50.  As a consequence, <u>Williams</u> rejected the defendant's

2  claim, both as an exercise of supervisory power and as Fifth Amendment common law.  <u>See</u> <u>id.</u> at 51-55.

3  Despite the holding in <u>Williams</u>, the instructions here assure the grand jurors that prosecutors would

4  present to them evidence that tended to undercut probable cause.  <u>See</u> Ex. A at 20.

5  Now, again, this emphasizes the difference between the function of the grand jury and the trial

6  jury.  You're all about probable cause.  If you think that there's evidence out there that might
   cause you say "well, I don't think probable cause exists," then it's incumbent upon you to hear
   that evidence as well.  As I told you, in most instances, *the U.S. Attorneys are duty-bound to*

7  *present evidence that cuts against what they may be asking you to do if they're aware of that*
   *evidence.*

8

9  <u>Id.</u> (emphasis added).  Moreover, the district court later returned to the notion of the prosecutors and their

10  duties, advising the grand jurors that they "can expect that the U.S. Attorneys that will appear in from of

11  [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you."  <u>See</u>

12  <u>id.</u> at 27.  The Ninth Circuit has already concluded it is likely this final comment is "unnecessary."  <u>See</u>

13  <u>Navarro-Vargas</u>, 408 F.3d at 1207.

14  This particular instruction has a devastating effect on the grand jury's protective powers, particularly

15  if it is not true.  It begins by emphasizing the message that <u>Navarro-Vargas II</u> somehow concluded was not

16  conveyed by the previous instruction: "You're all about probable cause."  <u>See</u> Ex. A at 20.  Thus, once

17  again, the grand jury is reminded that they are limited to probable cause determinations (a reminder that was

18  probably unnecessary in light of the fact that Judge Burns had already told the grand jurors that they likely

19  would be excused if they rejected this limitation).  The instruction goes on to tell the grand jurors that they

20  should consider evidence that undercuts probable cause, but also advises the grand jurors that the prosecutor

21  will present it.  The end result, then, is that grand jurors should consider evidence that goes against probable

22  cause, but, if none is presented by the government, they can  presume that there is none.  After all, "in most

23  instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking

24  you to do if they're aware of that evidence."  <u>See</u> <u>id.</u>  Moreover, during voir dire, Judge Burns informed the

25  jurors that "my experience is that the prosecutors don't play hide-the-ball.  If there's something adverse or

26  that cuts against the charge, you'll be informed of that.  *They have a duty to do that.*"  <u>See</u> Ex. B at 14-15

27  (emphasis added).  Thus, if the exculpatory evidence existed, it necessarily would have been presented by

28  the "duty-bound" prosecutor, because the grand jurors "can expect that the U.S. Attorneys that will appear

in from of [them] will be candid, they'll be honest, and ... they'll act in good faith in all matters presented to you." See Ex. A at 27.

These instructions create a presumption that, in cases where the prosecutor does not present exculpatory evidence, no exculpatory evidence exists. A grand juror's reasoning, in a case in which no exculpatory evidence was presented, would proceed along these lines:

(1)    I have to consider evidence that undercuts probable cause.
(2)    The candid, honest, duty-bound prosecutor would, in good faith, have presented any such evidence to me, if it existed.
(3)    Because no such evidence was presented to me, I may conclude that there is none.

Even if some exculpatory evidence were presented, a grand juror would necessarily presume that the evidence presented represents the universe of all available exculpatory evidence; if there was more, the duty-bound prosecutor would have presented it.

The instructions, therefore, discourage investigation -- if exculpatory evidence were out there, the prosecutor would present it, so investigation is a waste of time -- and provide additional support to every probable cause determination: i.e., this case may be weak, but I know that there is nothing on the other side of the equation because it was not presented. A grand jury so badly misguided is no grand jury at all under the Fifth Amendment.

## V.

## MOTION TO COMPEL PRODUCTION OF THE GRAND JURY TRANSCRIPTS

Mr. Haynes moves to dismiss the indictment due to the various errors committed in the course of impaneling and instructing the January 2007 grand jury. One of his challenges raises Judge Burns' misstatements regarding the prosecutors' duty to present evidence to the grand jury that "cuts against what they may be asking [the grand jurors] to do." See Instructions at 20.

Judge Moskowitz recently ruled on a motion similar to that filed by Mr. Haynes  See United States v. Martinez-Covarrubias, Case No. 07cr0491-BTM, Order Denying Defendant's Motion to Dismiss the Indictment, dated October 11, 2007 (hereinafter "Order").[8]  Judge Moskowitz did recognize that the instruction cited above is error, although he incorrectly found that it was not structural. See Order at 11. Because, under the analysis proposed by Judge Moskowitz's order, this Court must determine whether the

---

[8]  A copy of the Order is attached hereto as Exhibit C.

1   error was harmless, Mr. Haynes files the instant motion to produce the transcripts of the grand jury

2   proceedings that resulted in the instant indictment.

3   **A.    RELEVANT FACTS**

4       Discovery provided by the government that was in their possession at the time of indictment contains

5   significant exculpatory information.

6       **1.    The government's own evidence negates Count 4 of the indictment**

7   Count 4 of the indictment alleges that Mr. Haynes did:

8       with the intent to violate the immigration laws of the United States, knowing and in reckless
        disregard of the fact that an alien, namely, Jesus Nava-Montenegro, had come to, entered and
9       remained in the United States in violation of law, did transport and move said alien within
        the United States in furtherance of such violation of law. . .

10

11  There is no evidence that Mr. Haynes ever transported or moved Nava-Montenegro.  Moreover, at the time

12  of the indictment, the government contained information that affirmatively negated any evidence that Mr.

13  Haynes transported Mr. Montenegro.  After Agent Vasquez saw Mr. Haynes "walk towards" Nava-

14  Montenegro, Mr. Haynes drove away.  Nava-Montenegro remained:

15      Agent Vasquez observed the two individuals *who were going to load in the maroon
        Pathfinder walking south toward Mexico*.  The two individuals then observed Agent Vasquez
16      walking toward them and both started to run toward Mexico.  After a short foot chase, Agent
        Vasquez was able to stop one individual.  Agent Vasquez identified himself as a Border Patrol
17      Agent and questioned the individual as to his citizenship and immigration status.  This
        subject, later identified as NAVA-Montenegro, Francisco, admitted to being a citizen of
18      Mexico with no immigration documents [. . .].  NAVA was arrested and transported to the El
        Cajon Boarder Patrol Station [. . .].

19

20      Simply put, the government's own probable cause statement demonstrates that Mr. Haynes never

21  transported Nava-Montenegro.  Nava-Montenegro, even per the government's evidence was only "going

22  to" get in the vehicle.  He then began walking south toward Mexico.  He was subsequently arrested.  Where

23  an indictment is issued on a charge that is affirmatively negated by the government's evidence and

24  discovery, the legitimacy of the grand jury proceedings are seriously called into question.

25      **2.    The material witnesses were unable to identify Mr. Haynes**

26      Government discovery indicates that none of the individuals interviewed by border patrol were able

27  to identify Mr. Haynes as anything other than a person that was arrested at the same time as them.  Jesus

28

Nava-Montenegro (counts 3 and 4) states that he did not see the driver. When shown a photographic lineup he cannot identify the driver. In his interview with border patrol, Jorge Carino (counts 5 and 6) states that he did not see the driver. He is not shown the photo lineup. Salvador Garrido-Paz (counts 1 and 2) indicates that he did not see the driver of the vehicle until they were pulled over.

## B.    THE COURT SHOULD ORDER PRODUCTION OF THE GRAND JURY TRANSCRIPTS

The Court may order disclosure of grand jury proceedings "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii). The Ninth Circuit requires a "particularized need" to justify disclosure, see United States v. Walczak, 785 F.2d 852, 857 (9th Cir. 1986), but that need cannot be any different than the standard set forth in Rule 6(e)(3)(E)(ii): Mr. Haynes needs to show that "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added). That is why the Rule's "general suggestion [is] in favor of disclosure." See Walczak, 785 F.2d at 857. Here, under Judge Moskowtiz's approach to Judge Burns' erroneous instruction, it is clear that, at the very least, "a ground *may* exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added).

First, it is apparent that a ground *does* exist to dismiss the indictment: the grand jury found probable cause on a count that the government's evidence affirmatively negates. Second, however, Judge Burns instructed the grand jury that the prosecutor would disclose exculpatory evidence, because she was duty-bound to do so. This instruction, when combined with an actual failure to disclose exculpatory evidence, is extremely prejudicial to the grand jury's role as "gatekeeper." Failure to disclose exculpatory evidence to a grand jury so instructed would be grounds to dismiss the indictment.

Judge Burns instructed the grand jury that "in most instances, the U.S. Attorneys are duty-bound to present evidence that cuts against what they may be asking you to do if they're aware of that evidence." Instruction at 20. According to Judge Moskowitz, "if Defendant can establish that the Government in fact knew of exculpatory evidence that was not presented to the grand jury and that this failure to present exculpatory evidence, in conjunction with Judge Burns' comments, 'substantially influenced the grand jury's

1  decision to indict' or raises 'grave doubt' that the decision to indict was free of the substantial influence of

2  such events, the Court may dismiss the indictment under its supervisory powers." See Order at 11-12, citing

3  Bank of Nova Scotia v. United States, 487 U.S. 250 (1988). Because Judge Moskowitz assigned the burden

4  of proving that to the defendant there, Martinez-Covarrubias, he granted Mr. Martinez-Covarrubias "leave

5  to conduct discovery regarding what evidence was presented to the grand jury." See id. at 12. This Court

6  should do the same here.

7       The court has more reason to do so here because, in fact, the Government had exculpatory

8  information in its possession at the time of indictment.   The Martinez-Covarrubias Order cites no

9  exculpatory information.  Here, in contrast, the government well knew that Nava-Montenegro was never

10 transported by Mr. Haynes, even according to its own discovery.  Further, it knew that not a single material

11 witness could identify Mr. Haynes as anything other than a person who was arrested with them.  The

12 government knew that one of the material witnesses was not even shown a photo lineup because he told

13 agents he would not be able to identify the driver of the car.  The government also knew that another

14 witness *was* shown a photo line-up, but was unable to identify Mr. Haynes in any way.

15      That evidence is exculpatory because none of the witnesses could identify him in connection with

16 any loading or unloading of the vehicle.  This undercuts any government claim that Mr. Haynes "knowingly

17 and intentionally aided, counseled, commanded, induced or procured [the principal] to commit each

18 element." United States v. Lopez, 484 F.3d 1186, 1199 -1200 (9th Cir. 2008) (en banc) (The mere act of

19 picking up aliens at a location near the border and transporting them within the United States is not

20 sufficient to support a conviction for aiding and abetting a "brings to" offense).

21      Because on its face, a ground exists to dismiss count 4 of the indictment, the court should order that

22 the transcripts be produced to defense counsel.  Because the "particularized need" standard, see Walczak,

23 785 F.2d at 857, requires only a showing "a ground *may* exist to dismiss the indictment because of a matter

24 that occurred before the grand jury," Fed. R. Crim. P. 6(e)(3)(E)(ii) (emphasis added), and because the

25 Rule's "general suggestion [is] in favor of disclosure," see Walczak, 785 F.2d at 857, this Court should

26 order disclosure in order to permit Mr. Haynes to meet his burden under Judge Moskowitz's approach. See

27 Order at 12.

28

1

## VI.

2

## <u>THIS COURT SHOULD SUPPRESS ALL EVIDENCE BECAUSE IT WAS OBTAINED IN VIOLATION OF THE FOURTH AMENDMENT</u>

3

4      The agents in this case carried out an illegal stop, an illegal search, and an illegal arrest.  They

5  lacked reasonable suspicion to stop Mr. Haynes; their sole claim is that Mr. Haynes "walked toward" two

6  individuals, one of whom Border Patrol agents later determined to be unlawfully in the United States.  Their

7  warrantless arrest and search are presumptively unreasonable and the government has not shown that they

8  were supported by probable cause.  This court should suppress all evidence (including statements and

9  evidence seized) arising from the illegal stop, arrest and search.[9]

10 **A.    <u>Agents Had No Reasonable Suspicion to Stop the Vehicle.</u>**

11     Agent Vasquez observed Mr. Haynes "walk toward two individuals" who were "near the Pathfinder"

12 that he was subsequently driving.  Those individuals did not enter the Pathfinder.  Mr. Haynes got into it

13 and drove out of the parking lot.  Agent Vasquez then radioed to Agent Diaz, who began following the

14 Pathfinder driven by Mr. Haynes.  After Mr. Haynes had driven out of the parking lot, Agent Vasquez

15 apprehended one of the two individuals and determined that individual, Jesus Nava-Montenegro, was

16 undocumented.  The other individual fled to Mexico.  Based upon a radio relay from Agent Vasquez that

17 Nava-Montenegro was undocumented, Agents Napoli, Diaz, and Godreau then stopped the Pathfinder.

18 There was no reasonable suspicion of Mr. Haynes at this point.

19     Temporary detention of individuals by the police, even if only for a brief period and for a

20 limited purpose, constitutes a "seizure" within the meaning of the Fourth Amendment, and must be

21 supported by at least reasonable suspicion.  <u>See</u> <u>Delaware v. Prouse</u>, 440 U.S. 648, 653 (1979);

22 <u>United States v. Martinez- Fuerte</u>, 428 U.S. 543, 556 (1976).  The vehicle stop must be justified by

23 specific, articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct.  <u>See</u>

24 <u>Terry v. Ohio</u>, 392 U.S. 1 (1968).  This is true in the context of roving border patrol stops such as

25 that executed by Agents Vasquez, Diaz, Napoli, and Godreau.  <u>United States v. Brignoni-Ponce</u>,

26 _____

27     [9] At the very least, this Court should hold an evidentiary hearing to require the Government to prove reasonable suspicion to justify the stop.

28

1  422 U.S. 873 (1975) (roving border patrol agents must have reasonable suspicion, based on specific

2  and articulable facts, in order to initiate a stop).

3      "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its

4  protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest."

5  United States v. Arvizu, 534 U.S. 266, 273 (2002).  In the context of investigatory stops, "the Fourth

6  Amendment is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal

7  activity may be afoot...."  Id. (internal quotations omitted).  To sustain an officer's reasonable suspicion

8  determination, this Court "must look at the 'totality of the circumstances' ... to see whether the detaining

9  officer has a 'particularized and objective basis' for suspecting legal wrongdoing."  Id.  Although an officer

10  may rely upon "experience and specialized training to make inferences from and deductions about the

11  cumulative information available" to him before he makes an investigatory stop, "an officer's reliance on

12  a mere hunch is insufficient to justify [such] a stop...."  Id., at 273-274 (internal quotations omitted).

13      **i.      "Mere propinquity" does not establish reasonable suspicion**

14      To constitute reasonable suspicion, the objective circumstances must demonstrate "a

15  particularized and objective basis for suspecting *the particular person stopped* of criminal activity." United

16  States v. Cortez, 449 U.S. 411, 417-18 (1981); see also United States v. Berber-Tinoco, 510 F.3d 1083,

17  1087 (9th Cir. 2007) (citing Cortez).  "Mere propinquity to others independently suspected of criminal

18  activity" is not reason to invade an individual's fundamental Fourth Amendment rights.  Ybarra v. Illinois,

19  444 U.S. 85, 91 (1979).

20      Ybarra is directly on point here.  In Ybarra, agents had a warrant to search a bar and its bartender.

21  Ybarra was a patron of the bar at the time of the search.  Because he was in the bar, he was frisked.  Heroin

22  was discovered on his person.  Id. at 88-89.  The court found the frisk and subsequent search of Ybarra to

23  be unreasonable, holding that a "person's mere propinquity to others independently suspected of criminal

24  activity does not, without more, give rise to probable cause to search that person."  Id. at 91.  Even though

25  the officers had probable cause (and a warrant) to search the bar and the bartender, this did not provide them

26  even with reasonable suspicion to frisk Ybarra.  Id. at 92.  In short, "mere propinquity" to a person

27  suspected of criminal activity simply does not provide officers authority to disregard the Fourth

28

Amendment's requirement of a particularized and objective basis for suspicion as to *the person* upon whose rights the government intrudes.

Ybarra's requirement of more than mere proximity to individuals suspected of criminal activity has been strongly reaffirmed by the Ninth Circuit. "It is insufficient to point to the defendant's mere proximity to others independently suspected of criminal activity." United States v. Robertson, 833 F.2d 777, 783 (9th Cir. 1987). In Robertson the defendant Steeprow was walking out of a house they had reason to believe was a drug house. She was detained. However, Steeprow's "mere presence on the premises, without more, cannot support an arrest of her under these circumstances." The court determined that Steeprow was arrested, not merely detained, but the principle of Ybarra was strongly reaffirmed: mere propinquity—or proximity—to people independently suspected of criminal activity is not suspicious. Id.

**ii.    The totality of the circumstances fall far short of the reasonable suspicion standard**

Even if the "mere propinquity" to an individual who later turned out to be undocumented is *a* factor that can be considered, there was not, under the totality of the circumstances, reasonable suspicion to stop Mr. Haynes. The Arvizu case demonstrates how a Border Patrol agent properly formed reasonable suspicion to perform an investigatory vehicle stop. 534 U.S. at 277. In Arvizu, the agent articulated the following facts:

1.   a magnetic sensor alerted the agent to the presence of a vehicle on an unpaved, seldom traveled road used by smugglers to avoid Border Patrol checkpoints, Arvizu, at 268;
2.   the sensor alert occurred during a change in shifts which would leave the area unpatrolled by the agents, Id.;
3.   the same sensor had detected a minivan using the same route several weeks before which resulted in a marijuana seizure, Id., at 269-270;
4.   a second sensor signal indicated to the agent that the vehicle had turned onto another unpaved road on a route commonly used to circumvent checkpoints, Id., at 270;
5.   when the agent intercepted the vehicle, it turned out to be a minivan, Id.;
6.   when the agent followed the minivan, he noted that the occupants, who appeared to be a family, behaved strangely, first ignoring him and then waving in a mechanical manner, Id., at 270-271;
7.   the agent could see the children's knees, which indicated that their feet rested on some cargo. Id., at 270;
8.   the van turned onto a third, even rougher unpaved road, away from any checkpoint, and away from any destination a family might want to reach for recreation, Id., at 271; and
9.   a radio check by the agent indicated that the minivan was registered to an address four miles from the international border in a neighborhood notorious for smuggling activity, Id., at 271.

1    As a result, the agent in <u>Arvizu</u> had reasonable suspicion to perform an investigatory stop of the

2    minivan because he could:

3       infer from his observations, his registration check, and his experience that ... [the minivan]
        had set out ... along a little-traveled route used by smugglers to avoid the ... checkpoint[s] ...

4       at a time when officers would be leaving their ... shifts ... on unpaved and primitive roads.

5    <u>Arvizu</u>, 534 U.S. at 277.

6    In this case, however, the facts set forth by the *four* Border Patrol agents who had an opportunity to

7    view any suspicious activity are as follows:

8       1.    Mr. Haynes walked towards two individuals, one of whom later turned out to be
              undocumented, one of whom fled from the police.

9

10   As noted above, Mr. Haynes' mere proximity to these individuals was not in and of itself suspicious.

11   <u>Ybarra</u>, 444 U.S. at 91.  A comparison between the facts of <u>Arvizu</u> and the facts that form the particularized

12   and objective basis for suspecting legal wrongdoing in this case demonstrates that the agents had no

13   reasonable suspicion to stop the Pathfinder.  In <u>Arvizu</u>, the agent had nine *independent*, *particularized*, and

14   *objective* facts that gave them particular suspicion *of the individuals in the vehicle*.  <u>See</u> supra.  Thus, the

15   Supreme Court found that the agent had a reasonable suspicion that the occupants of the van were engaged

16   in criminal activity.  In the case at bar  the agents can muster *no* independent, objective fact that provides

17   particularized suspicion of Mr. Haynes.  <u>Cortez</u>, 449 U.S. at 417-18.

18   The facts indicate that Mr. Haynes was stopped because he "walked towards" two

19   individuals, one of whom the officer later determined to be undocumented.  This provides neither

20   particularized nor an objective basis for suspecting *Mr. Haynes* of criminal activity. <u>Id.</u>; <u>Berber-Tinoco</u>, 510

21   F.3d at 1087.   There are no factors listed which—independently or together—would rise to

22   reasonable suspicion to stop a vehicle.  As no reasonable suspicion exists, the evidence must be

23   suppressed under the Fourth Amendment.

24   **B.    The Agents Lacked Probable Cause to Arrest Mr. Haynes.**

25   Immediately upon smelling glue and hearing what "appeared to be people" moving in the car, the

26   agents arrested Mr. Haynes and searched his car.  Where an arrest is effectuated without a warrant, as in

27   this case, it must be supported by probable cause.  <u>United States v. Del Vizo</u>, 918 F.2d 821 (9th Cir. 1990).

28

1  Probable cause exists when an officer has "reasonably trustworthy information sufficient to warrant a

2  prudent person in believing that the accused had committed or was committing an offense." United States

3  v. Delgadillo-Velasquez, 856 F.2d 1292, 1296 (9th Cir. 1988) (citations omitted).

4  　　　The facts at this point consist of a bare proffer by an agent who was not present at the scene of the

5  search.  The probable cause statement states that the agents 1) smelled glue; and 2) heard noises inside the

6  speaker box in the rear vehicle of the car.  Even if these proffered facts are true, they do not provide

7  probable cause to arrest Mr. Haynes.  There is no reason that the smell of glue would contribute to a prudent

8  officer's belief that a crime was being committed.  The conclusory statement that sounds inside the vehicle

9  "appeared  to be of people" likewise does not provide probable cause.  Combined, both at most warrant

10  additional investigation; the officers here did not proceed to a Terry-style investigation, however; they

11  immediately arrested Mr. Haynes and searched his car.

12  　　　If the court disagrees with Mr. Haynes contention that the government has failed to show by a

13  preponderance of the evidence that probable cause existed, he respectfully requests that the government

14  prove the reasonableness of the warrantless arrest at an evidentiary hearing at which Mr. Haynes can

15  challenge the sufficiency of the government's probable cause.

16  **C.    Agents Had No Probable Cause to Search the Vehicle.**

17  　　　As with the arrest, under the totality of the circumstances, there was insufficient evidence to establish

18  probable cause to conduct a warrantless, nonconsensual search of the vehicle.  Accordingly, the Court must

19  suppress the evidence seized pursuant to his unlawful search.  The vehicle was searched without a warrant.

20  That search is therefore presumptively unreasonable.  See United States v. Hawkins, 249 F.3d 867, 872 (9th

21  Cir. 2001).  It is the government's burden to demonstrate that its agents complied with the Fourth

22  Amendment.  See id. Here, the agents baldly assert that they had probable cause to search the vehicle.  The

23  facts thus far indicated do not amount to probable cause, and thus suppression is warranted.  If the court

24  is disinclined to suppress the fruits of this presumptively unreasonable search, Mr. Haynes nevertheless

25  respectfully requests an evidentiary hearing on the issue of probable cause to search the vehicle.

26  //

27  //

28

1

**D.** **All Evidence Seized as a Result of the Unlawful Stop, Unlawful Arrest and Unlawful Search**
**Must Be Suppressed.**

2

3      All evidence seized pursuant to Mr. Haynes's unlawful stop, unlawful arrest and unlawful search

4    must be suppressed. See United States v. Patzer, 277 F.3d 1080, 1086 (9th Cir. 2002) (reversing because,

5    since the defendant's arrest was unlawful, "[t]he evidence obtained after his arrest, including his own

6    statements, his passenger's statements, and the physical evidence found during the search of his vehicle,

7    were 'fruit of the poisonous tree' and should have been suppressed by the district court"); see also Wong Sun

8    v. United States, 371 U.S. 471 (1963); Taylor v. Alabama, 457 U.S. 687, 694 (1982); Castillo v. De La

9    Renta, 806 F.2d 1071, 1076 (9th Cir. 1989). The suppression of evidence should include, but is not limited

10    to, all tangible evidence and statements. See e.g., Wong Sun, 371 U.S. 47; Taylor v. Alabama, 457 U.S.

11    at 694; Patzer, 277 F.3d at 1080. Therefore, this Court should suppress all evidence related to the invalid

12    arrest and invalid search.

13                                          **VII.**

14      **THIS COURT SHOULD DISMISS THE INDICTMENT BECAUSE THE GOVERNMENT**
                    **DEPORTED EXCULPATORY WITNESSES**

15

16      The indictment should be dismissed because the government violated Mr. Haynes' right to due

17    process under the Fifth Amendment and to compulsory due process under the Sixth Amendment when it

18    removed to Mexico six other individuals encountered with Mr. Haynes. See United States v. Valenzuela-

19    Bernal, 458 U.S. 858 (1982); see also United States v. Mendez-Rodriguez, 450 F.2d 1 (9th Cir. 1971)

20    (government may not deport witnesses who might help the defense); United States v. Gamez-Orduno, 235

21    F.3d 453, 461 (9th Cir. 2000) ("The suppression of material evidence helpful to the accused, whether at trial

22    or on a motion to suppress, violates due process if there is a reasonable probability that, had the evidence

23    been disclosed, the result of the proceeding would have been different).

24      Mr. Haynes, when asked if he wanted to sign the "Lujan-Castro" form repeatedly requested an

25    attorney in order to discuss whether and which material witnesses would or might have exculpatory

26    evidence in his case. He never signed the form, because he was never allowed to speak with an attorney.

27

28

**A.** **The Indictment must Be Dismissed Because the Government Failed to Make a Good Faith Determination as to Whether Any of the Six Alien Witnesses Apprehended with Mr. Haynes Possessed Material and Favorable Information to the Defense.**

In <u>Valenzuela-Bernal</u>, 458 U.S. at 861, three undocumented aliens were apprehended with the defendant after he led the officers on a high speed chase through an immigration checkpoint. Following their arrest, officers interviewed the defendant and all three undocumented aliens. <u>Id.</u> The three undocumented aliens identified the defendant as the driver. <u>Id.</u> The officers then contacted an Assistant United States Attorney who concluded that the aliens possessed no evidence material to either the prosecution or the defense. <u>Id.</u> Two of the three aliens were deported to Mexico. <u>Id.</u> The defendant was charged with transporting an illegal alien. The defendant made no attempt to explain how the two people who were deported could assist him in proving that he did not know that the third person, who was detained as a witness, was not an illegal alien. <u>Id.</u>

The Supreme Court reaffirmed that the deportation of alien witnesses can violate the Fifth Amendment right to due process as well as the Sixth Amendment right to compulsory process, but rejected the Ninth Circuit's "conceivable benefit" test because it found that such a test was a virtual "per se" rule which required little if any showing that the testimony of the absent witnesses would have been either favorable or material. <u>Id.</u> at 866. Thus, the Court held that something more than the mere absence of testimony is necessary to establish a violation of the Fifth and Sixth Amendments. <u>Id.</u> at 872 (discussing Fifth Amendment right); <u>id.</u> at 867 (discussing Sixth Amendment right). Specifically, the defendant must at least make a plausible showing of how the missing witnesses' testimony would have been both material and favorable to his defense. <u>Id.</u> at 867.

However, the Court noted that because prompt deportation deprives the defendant of an opportunity to interview the witnesses, "the defendant cannot be expected to render a detailed description of their lost testimony." <u>Id.</u> at 873. The Court further noted that the fact that a defendant has no opportunity to interview the deported witnesses may also support a relaxation of the materiality requirement. <u>See id.</u> at 870. "[T]he events to which a witness might testify, and the relevance of those events to the crime charged, may well demonstrate either the presence or absence of the required materiality." <u>Id.</u> at 871.

1    Important to the holding in <u>Valenzuela-Bernal</u> was the fact that the government interviewed all of

2    the witnesses prior to deporting them.  Thus, the Court noted that "the prompt deportation of alien witnesses

3    who are determined by the Government to possess no material evidence relevant to a criminal trial is

4    justified by several practical considerations."  <u>Id.</u> at 865.  Implicit in this statement is the duty of the

5    government to first make a good faith determination that the alien witnesses possess no evidence favorable

6    to the defense before removing them.

7    In contrast, here, the government failed to interview the alien witnesses regarding what if any

8    information they had regarding the allegations against Mr. Haynes and specifically, what information they

9    had about the stop of the vehicle Mr. Haynes was driving.

10   The government's lack of good faith, or in other words, bad faith is apparent from the facts.  Unlike

11   the agents in <u>Valenzuela-Bernal</u>, it appears that the agents here completely failed to interview two of the

12   three witnesses who were deported to determine whether they had any information material to the validity

13   of the stop, despite the fact that it was quite obvious that they would not be able to identify Mr. Haynes.

14   Further, the government removed the witnesses despite Mr. Haynes's *repeated and insistent request* to

15   speak with his attorney before signing the form waiving his right to demand that alien witnesses be retained.

16   <u>See</u> <u>United States v. Lujan-Castro</u>, 602 F.2d 877, 878-79 (9th Cir. 1979) (reaffirming the significance of

17   the right to retain deportable alien witnesses as established in <u>Mendez-Rodriguez</u>, but holding that such

18   right could be waived, so long as any such waiver was made knowingly and intelligently).

19   Where, as here, the government failed to interview two of the three witnesses before removing them

20   to Mexico in order to make any good faith determination whether the witnesses possessed evidence

21   favorable to the defense, the requirement under <u>Valenzuela-Bernal</u> that the defendant present a plausible

22   theory as to how the testimony of the deported witnesses would be both material and favorable to the

23   defense should not apply.  <u>See</u> <u>Valenzuela-Bernal</u>, 458 U.S. at 867 (explaining that defendant must make

24   a plausible showing of how the deported witnesses' testimony would have been material and favorable to

25   the defense).

26   //

27   //

28

33                                    08cr0366-DMS

1

2

**B.    The Alien Witnesses Removed by the Government Possessed Information That Was Both Material and Favorable to the Defense.**

3

4

5

6

7

8

9

10

11

12

Although Mr. Haynes contends that under the circumstances he does not need to make a plausible showing that the testimony of the deported witnesses' testimony would be material and favorable to the defense, he can easily do so in this case.  First, Mr. Haynes believes that the witnesses who were removed from this country would corroborate his version of the events regarding the stop.  For example, they could testify that he was not driving erratically before he was pulled over, and that the car did not "smell like glue," one of two factors cited by the government as grounds for probable cause to arrest Mr. Haynes and search his car.  Second, Mr. Haynes *knows* that one of the witnesses would testify that she never saw him before she was arrested alongside him, because she was interviewed and said so to Border Patrol agents; he further believes that two other deported witnesses would testify to the same, but does not know because they were not interviewed.

13

14

**C.    The Court Should Hold an Evidentiary Hearing to Determine Whether Two of the Three Deported Witnesses Were Interviewed and What Information Was Obtained from them Prior to Their Removal.**

15

16

17

18

19

20

21

The government has the obligation to provide a defendant with all exculpatory evidence within its control.  See Brady v. Maryland, 373 U.S. 83, 87 (1963); see also Gamez-Orduno, 235 F.3d at 461.  The government should not be able to avoid its obligation under Brady by destroying exculpatory evidence before the defendant has the opportunity to preserve it for trial.  For that reason, a showing of bad faith is not required where the government removes people it knows can provide exculpatory evidence.  Cf. United States v. Dring, 930 F.2d 687 (9th Cir. 1991) (no one knew what witnesses would have said); Mendez-Rodriguez, 450 F.2d 1 (same); Valenzuela-Bernal, 458 U.S. 858 (same).

22

23

24

25

26

27

As Judge Kozinski explained in his dissent in United States v. Ramirez-Lopez, 315 F.3d 1143, 1165 (9th Cir. 2003) (withdrawn), the bad faith requirement only applies "to innocent removal of aliens by the government." Id.  "Cases where the government removes aliens it knows can provide exculpatory evidence are analyzed pursuant to the standard developed in Brady, and in such cases-let's all say it together-'the question of bad faith [is] irrelevant." Id.; see also Dring, 930 F.2d at 693, n. 7 (explaining that the bad faith requirement does not apply where the government fails to disclose evidence which it knew to be

28

1  exculpatory).  Thus, if the defendant's assumption that the agents did not interview the witnesses is wrong,

2  and the witnesses did in fact advise the agents that the vehicle was not driving erratically, and that they

3  could *not* identify Mr. Haynes, a showing of bad faith is not required.  Therefore, this Court should hold

4  an evidentiary hearing to determine whether any of the agents knew that the deported aliens could testify

5  that they could not recognize the driver, he was not driving erratically, and they had never seen him before.

6  If any of the agents knew that the witnesses had such information, the indictment must be dismissed

7  regardless of whether the government acted in "bad faith."

8  **D.    Conclusion**

9       The Court should dismiss the indictment under the Fifth Amendment due process clause and the

10  Sixth Amendment compulsory process clause because: 1) the government failed to make a good faith

11  determination as to whether the alien witnesses possessed material evidence favorable to the defense, 2)

12  the government voluntarily returned to Mexico three people without questioning two of them regarding the

13  circumstances of the stop and without obtaining contact information for them sufficient to enable defense

14  counsel to locate them in Mexico, 3) Mr. Haynes has made a plausible showing that the witnesses possessed

15  material evidence favorable to the defense, and 4) Mr. Haynes refused to sign the Lujan-Castro waiver form

16  and repeatedly asked for an attorney in order to discuss its import with him.  Alternatively, if the Court

17  declines to the dismiss the indictment outright, Mr. Haynes respectfully requests an evidentiary hearing on

18  the matter.

19                                    **VIII.**

20  <u>**THIS COURT SHOULD SUPPRESS THE STATEMENTS OF ALL UNAVAILABLE**</u>
    <u>**WITNESSES**</u>

21

22       Pursuant to <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), this Court should suppress the statements

23  of all unavailable witnesses, including the statements given by the three alleged undocumented aliens who

24  were deported.  If the government intends to introduce statements by any of these witnesses, Mr. Haynes

25  requests notice specifying exactly what statements they seek to admit at least three weeks prior to trial so

26  that the admissibility of the statements can be litigated in advance of trial.

27  //

28

**IX.**

## THIS COURT SHOULD SEVER COUNTS ONE, THREE, AND FIVE FROM COUNTS TWO, FOUR, AND SIX PURSUANT TO RULE 14.

Rule 14 of the Federal Rules of Criminal Procedure provides in relevant part:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

The joinder of these counts for trial may prevent Mr. Haynes from exercising either his constitutional right against self-incrimination or his right to testify on her own behalf. Where a criminal defendant has a legitimate need to testify as to some counts, and not testify as to other counts which are joined under Federal Rule of Criminal Procedure 8(a), there exists a real and genuine threat to the two constitutional rights mentioned above.

The Court of Appeals for the District of Columbia has analyzed this dilemma as follows:

> Prejudice may develop when an accused wishes to testify on one but not the other of two joined offenses which are clearly distinct in time, place and evidence. His decision whether to testify will reflect a balancing of several factors with respect to each count . . . . But if the two charges are joined for trial, it is not possible for him to weigh these factors separately as to each count. If he testifies on one count, he runs the risk that any adverse effects will influence the jury's considerations of the other count. Thus, he bears the risk on both counts, although he may benefit on only one. Moreover, a defendant's silence on one count would be damaging in the face of his express denial of the other. Thus, he may be coerced into testifying on the count upon which he wishes to remain silent. It is not necessary to decide whether this invades his constitutional right to remain silent, since we think it constitutes prejudice within the meaning of Rule 14.

Cross v. United States, 335 F.2d 987, 989 (D.C. Cir. 1964) (emphasis added).

Here, Mr. Haynes will almost certainly invoke his right to remain silent as to Counts One, Three, and Five, but may well testify as to Counts Two, Four, and Six. Thus, joinder of Count One, Three, and Five with Counts Two, Four and Six is prejudicial within the meaning of Rule 14 of the Federal Rules of Criminal Procedure. In Mr. Haynes' case, this will be exceptionally prejudicial. As this court is well aware, exercising the right to testify is accompanied by the impeachment of that testimony by 404(b) evidence. The 404(b) evidence defense counsel believes the government will introduce has a high likelihood of prejudicing the jury with regard to three bring-to counts, but not to the three transport counts. If this Court

1  fails to sever Counts One, Three, and Five from the remaining three counts, Mr. Haynes' constitutional right

2  to remain silent and his right to testify will be in direct conflict with each other.  This would be

3  impermissible and requires severance of counts.

4       Moreover, the evidence the government has on the bring-to counts is far weaker than the evidence

5  on the transport counts. Such prejudice is inherent in joinder.  Here, however, it is combined with the

6  prejudice to Mr. Haynes once he makes the decision whether to testify or remain silent.  In <u>Bean v.</u>

7  <u>Calderon</u>, the Ninth Circuit has stated that "strong evidence of [the defendant's] guilt in [one crime] [could]

8  taint[] the jury's consideration of [the defendant's] complicity in the [other crime]. <u>Calderon</u>, 63 F.3d 1073,

9  1085 (9th Cir. 1998). Other circuits are in accord.  <u>See</u> <u>Lucero v. Kerby</u>, 133 F.3d 1299, 1315 (10th Cir.

10 1998) ( "One danger in joining offenses with a disparity of evidence is that the State may be joining a strong

11 evidentiary case with a weaker one in the hope that an overlapping consideration of the evidence [will] lead

12 to convictions on both.") (brackets in original); <u>see also United States v. Lewis</u>, 787 F.2d 1318, 1322 (9th

13 Cir. 1986) (considering relative strength of evidence underlying joined charges as demonstrating prejudice.

14      Here, the evidence that Mr. Haynes transported undocumented aliens on February 5, 2008 is

15 significantly stronger than the evidence of his alleged role in bringing aliens to the United States on that

16 day.  He was the driver and sole occupant of the vehicle in which the aliens were discovered.  This is strong

17 (though insufficient) evidence against him.  However, the mere act of picking up aliens at a location near

18 the border and transporting them within the United States is not sufficient to support a conviction for aiding

19 and abetting a "brings to" offense. <u>Lopez</u>, 484 F.3d at 1199 -1200.  Thus, the evidence against him on the

20 bring-to counts is much weaker. <u>Id.</u>

<b>X.</b>

21

22  <b><u>MOTION FOR LEAVE TO FILE ADDITIONAL MOTIONS</u></b>

23      Defense counsel has received 125 pages of discovery in this case as of filing the instant pleadings.

24 As information comes to light, due to the government providing additional discovery in response to these

25 motions or an order of this Court, the defense may find it necessary to file further motions.  It is, therefore,

26 requested that defense counsel be allowed the opportunity to file further motions based upon information

27 gained through the discovery process.

28

37                                                                                    08cr0366-DMS

<u>**CONCLUSION**</u>

For these and all the foregoing reasons, the defendant, Mr. Haynes, respectfully requests that this Court grant his motions and grant any and all other relief deemed proper and fair.

Respectfully submitted,

Dated: February 22, 2008

*/s/ David M.C. Peterson*
**DAVID M.C. PETERSON**
Federal Defenders of San Diego, Inc.
Attorneys for Mr. Haynes

N:\Cases\1324\Haynes\haynes.disc.mtn.wpd

INDEX OF EXHIBITS

Exhibit A       -       Partial Transcript of Proceedings, January 11, 2007

Exhibit B       -       Full Transcript of Proceedings, January 11, 2007

Exhibit C

1

## CERTIFICATE OF SERVICE

2    Counsel for Defendant certifies that the foregoing is true and accurate to the best information and

3    belief, and that a copy of the foregoing document has been caused to be delivered this day upon:

4    Courtesy Copy to Chambers

5    Copy to Assistant U.S. Attorney via ECF NEF

6    Copy to Defendant

7    Dated:  March 14, 2008                    /s/ DAVID M. PETERSON
                                              Federal Defenders of San Diego, Inc.
8                                              225 Broadway, Suite 900
                                              San Diego, CA  92101-5030
9                                              (619) 234-8467  (tel)
                                              (619) 687-2666  (fax)
10                                             david_peterson@fd.org (email)

11

12

13

14

15

16    N:\Cases\1324\Haynes\haynes.disc.mtn.wpd

17

18

19

20

21

22

23

24

25

26

27

28