KAREN P. HEWITT
United States Attorney
EUGENE S. LITVINOFF
Assistant U.S. Attorney
California State Bar No. 214318
United States Attorney's Office
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone: (619) 557-5790 / (619) 235-2757 (Fax)
Email: Eugene.Litvinoff2@usdoj.gov

Attorneys for Plaintiff
United States of America

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Criminal Case No. 08CR0366-DMS |
|---|---|---|
| Plaintiff, | ) | Date:      March 28, 2008 |
| | ) | Time:      11:00 a.m. |
| v. | ) | |
| | ) | GOVERNMENT'S RESPONSE AND |
| JAMES HAYNES III, | ) | OPPOSITION TO DEFENDANT'S |
| | ) | MOTION TO: |
| Defendant. | ) | |
| | ) | (1)  COMPEL DISCOVERY; |
| | ) | (2)  PRESERVE EVIDENCE; |
| | ) | (3)  DISMISS THE INDICTMENT; |
| | ) | (4)  PRODUCE GRAND JURY TRANSCRIPT; |
| | ) | (5)  SUPPRESS EVIDENCE; |
| | ) | (6)  DISMISS THE INDICTMENT; |
| | ) | (7)  SUPPRESS STATEMENTS; |
| | ) | (8)  SEVER COUNTS; AND |
| | ) | (9)  REQUEST LEAVE TO FILE FURTHER |
| | ) | MOTIONS; |
| | ) | |
| | ) | TOGETHER WITH STATEMENT OF |
| | ) | FACTS, MEMORANDUM OF POINTS |
| | ) | AND AUTHORITIES, AND |
| | ) | GOVERNMENT'S MOTION FOR: |
| | ) | |
| | ) | (1)  RECIPROCAL DISCOVERY |
| | ) | |
| _____ | ) | |

COMES NOW, the plaintiff, UNITED STATES OF AMERICA, by and through its counsel

Karen P. Hewitt, United States Attorney, and Eugene S. Litvinoff, Assistant U.S. Attorney, and

hereby files its Response and Opposition to the motions filed on behalf of the above-captioned

1  defendant and hereby files its Motion For Reciprocal Discovery.  This Response and Opposition

2  and Motion For Reciprocal Discovery is based upon the files and records of this case.

**I**

**INTRODUCTION**

Defendant stands charged in a six-count Indictment with: (1) three counts of bringing in illegal aliens for financial gain (counts 1, 3, and 5), in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) and (2) three counts of transportation of illegal aliens (counts 2, 4, and 6), in violation of 8 U.S.C. § 1324(a)(1)(A)(ii).

**II**

**STATEMENT OF FACTS**

**A.    Initial Observations – Three Dollar Parking Lot**

On the morning of February 5, 2008, U.S. Border Patrol Agents from the El Cajon Station Tactical Intelligence Unit were conducting anti-smuggling surveillance operations near the international border in Tecate, California.  In particular, agents were surveilling the Three Dollar Parking Lot, located approximately 300 yards north of the United States / Mexico international boundary fence.  In the agents' experience, this parking lot is commonly used by alien smugglers as a staging area.

At approximately 8:00 a.m., Agent Vasquez observed Defendant walk towards a maroon Nissan Pathfinder (Baja California License Plate No. AHJ-31-21) and open the vehicle door. Vasquez then observed Defendant walk toward two individuals who appeared as if they were going to enter the Nissan Pathfinder.  The individuals did not get into the vehicle.  Defendant entered the vehicle and drove out of the Three Dollar Parking lot.  Agent Vasquez observed Defendant turning northbound on Highway 188 toward State Route 94.  The two individuals began walking south toward Mexico.

**B.    Agent Vasquez Stops One of the Two Individuals**

Agent Vasquez began walking toward the two individuals.  Upon seeing Agent Vasquez, the two began to run toward Mexico.  After a short foot-chase, Agent Vasquez was able to stop one of the individuals, later identified as Francisco Nava-Montenegro.  Agent Vasquez identified

himself as a U.S. Border Patrol Agent and questioned Nava-Montenegro as to his immigration status in the United States. Nava-Montenegro stated that he did not have any immigration documents that allowed him to legally enter or remain in the United States. The other individual absconded into Mexico.

**C.    Continued Vehicle Surveillance and Stop**

At the same time that Agent Vasquez was pursing the two individuals in the Three Dollar Parking Lot, Agent Vasquez also informed Agent Diaz, through radio communication, of Defendant's location. Agent Diaz positioned his unmarked patrol vehicle in a "look out" position near the intersection of Highway 188 and State Route 94. He observed Defendant turn eastbound onto State Route 94.

As Defendant's vehicle passed Highway 188 and State Route 94, Agent Godreau, also driving an unmarked vehicle, joined Agent Diaz in following Defendant from a discreet distance. Agent Diaz informed Agent Napoli, who was driving a marked Border Patrol vehicle, of the direction Defendant was heading. Agent Napoli positioned himself on State Route 94 by the Mt. Empire Campgrounds. As Defendant passed Agent Napoli's position, Agent Napoli pulled behind Defendant and performed a vehicle stop. The stop occurred off the south side of State Route 94, near Zuellner's in Campo, California.

**D.    Questioning, Search, and Arrest**

Agents Napoli, Diaz, and Godreau approached the Nissan Pathfinder and identified themselves as Border Patrol Agents. They questioned Defendant regarding his citizenship – Defendant stated that he was a United States citizen. During the questioning, Agents Napoli and Diaz noticed the strong odor of glue coming from the inside of the vehicle. Both agents also heard what sounded like people moving around in a speaker box inside the vehicle. Based on these observations, the agents believed that Defendant was smuggling aliens concealed in the speaker box.

The agents opened the speaker box from the rear seat and found inside the speaker box five (5) people stacked on top of each other. The agents identified themselves and helped all the individuals of the speaker box (3 adults and 2 juveniles were removed from the speaker box). The

1    agents performed a field interview and determined that all five individuals were citizens and

2    nationals of Mexico, and that none of them possessed immigration documents that would allow

3    them to enter or remain in the United States legally.

4         Defendant, along with the five individuals removed from the speaker box, were arrested

5    and transported to the El Cajon Border Patrol Station for processing.

6    **E.**    **Defendant's Post-Arrest Interview**

7         **1.**    **Lujan-Castro**

8         At approximately 1:13 p.m., Agent Diaz explained to Defendant that he could request the

9    retention of any aliens arrested with him that could have anything favorable to say in his defense.

10   Defendant stated that he understood Agent Diaz's advisal of rights, but that he could not make a

11   determination without the advice of an attorney.  Defendant declined to sign the Lujan-Castro

12   waiver form, and he also declined to specify any aliens he wished to retain without the advice of

13   counsel.

14        **2.**    **Miranda**

15        After discussing Defendant's Lujan-Castro rights, Agent Diaz asked Defendant if he

16   remembered Agent Diaz reading him his Miranda rights at the time of  arrest.  Defendant stated

17   that he did remember.  Agent Diaz re-read Defendant his Miranda rights in the English language.

18   Defendant stated that he once again understood his rights and that he would not answer any

19   questions without the presence of an attorney.  At this point, all questioning ceased.

20   **F.**    **Material Witness Statements**

21        **1.**    **Salvador Garrido-Paz**

22        Material Witness Salvador Garrido-Paz stated that he is a Mexican citizen and national, and

23   that he does and never has had proper immigration documentation that would allow him to enter

24   or remain in the United States legally.  He further stated that he knowingly entered the United

25   States illegally on February 5, 2008 by jumping over the border fence west of the Tecate,

26   California Port of Entry.  He stated that he made arrangements with an unknown smuggler in

27   Tijuana, Mexico to be smuggled into the United States for $2,000.

28

Garrido-Paz stated that he was told to take a bus to Tecate, Mexico, where he spent the night at the Hotel Jimenez. He stated that early that morning, he was taken to the border fence where he and others crossed illegally into the United States. He stated that a foot-guide took the group to a parking lot where they were told to load into a vehicle. He stated that he and four others, including a mother and her two children, were placed into a secret compartment inside the car. He stated that the compartment was too small for them and that his arm began to hurt. He also stated that he feared for his life because he had difficulty breathing while inside the compartment. He told agents that he yelled at the driver to let them out of the compartment, without success.

After being shown a photo-lineup with six photographs, Garrido-Paz identified Defendant as someone being arrested at the scene. Garrido-Paz stated, however, that he did not see Defendant prior to the arrest.

### 2. Jesus Nava-Montenegro

Material Witness Jesus Nava-Montenegro stated that he is a Mexican citizen and national, and that he does not and never has had proper immigration documentation that would allow him to enter or remain in the United States legally. He further stated that he knowingly entered the United States illegally on February 5, 2008 by jumping over the border fence west of the Tecate, California Port of Entry. Nava-Montenegro stated that his mother made the smuggling arrangements with an unknown smuggler in Tijuana, Mexico, and that he does not know how much she was going to pay the smuggler.

This witness stated that he was told to take a bus to a town east of Tijuana, where he would then be taken over the border. He stated that he and several others jumped the border fence and walked to a parking lot. He stated that five of the people he crossed with were loaded into a vehicle. He stated that the foot-guide told him not to get into the car, but instead to follow him. Nava-Montenegro stated that shortly after, he was arrested by Border Patrol.

Nava-Montenegro was shown a photo line-up consisting of six photos. He was unable to identify any of the pictures as the person who was going to drive the load vehicle.

//

//

### 3.    Jorge Carino-Arias

Material Witness Jorge Carino-Arias stated that he is a Mexican citizen and national, and that he does not have proper immigration documentation that would allow him to enter or remain in the United States legally.  He stated that his father was going to pay between $1,000 and $2,000 for him to be smuggled to Temecula, California.  He further stated that the unknown smuggler told him to take a bus to Tecate, Mexico.  There, the smuggler introduced the witness to several individuals who were going to cross into the United States with him.  Carino-Arias stated that the smuggler guided the group across the border and told them to lie down near two trailers.  He further stated that after waiting for about two hours, the smuggler told him to get inside a vehicle. He stated that he entered the vehicle through the rear back door and that he was told to lie down inside a small hidden compartment.

This witness was not presented with a photo-lineup since he stated that he never saw the Defendant prior to the arrest.

### G.    Released Material Witnesses

Upon her request, Laura Lopez-Alfaro, and her two juvenile children (ages 11 and 13) were voluntarily returned to Mexico.  Prior to being returned, Lopez-Alfaro stated that she had met an unknown smuggler in Tecate, Mexico.  She stated that the smuggler have her specific instructions to stay close to him and to not make any noise.  Lopez-Alfaro stated that the smuggler informed her that they would walk for several minutes, and then would be picked up at a parking lot.

She further stated that her husband made arrangements to pay an unknown amount of money for her and her children to be smuggled to Los Angeles.  She stated that she was told to get inside the back of a vehicle, where she and her two children were placed in a small compartment along with two other individuals.  She stated that she and her children were very scared and that it was hard to breath inside the compartment.  She stated that one of the individuals was complaining of pain due to the lack of oxygen in the compartment.  She stated that she never saw the driver of the vehicle until she was apprehended by Border Patrol.

//

//

**H.    Criminal History**

Defendant was apprehended smuggling two aliens in the trunk of a vehicle on October 26, 2006.

## III

## POINTS AND AUTHORITIES

**A.    THE GOVERNMENT WILL CONTINUE TO COMPLY WITH ALL ITS DISCOVERY OBLIGATIONS**

The Government intends to fully comply with its discovery obligations under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), the Jencks Act (18 U.S.C. § 3500), and Rule 16 of the Federal Rules of Criminal Procedure. The Government has made approximately 125 pages of discovery and a DVD recording available to the defense. The Government anticipates that most discovery issues can be resolved amicably and informally, and has addressed Defendant's specific requests below.

**(1)    The Defendant's Statements**

The Government recognizes its obligation under Rules 16(a)(1)(A) and 16(a)(1)(B) to provide to Defendant the substance of Defendant's oral statements and Defendant's written statements. The Government has produced all of Defendant's written and videotaped statements that are known to the undersigned Assistant U.S. Attorney at this date. If the Government discovers additional oral or written statements that require disclosure under Rule 16(a)(1)(A) or Rule 16(a)(1)(B), such statements will be provided to Defendant.

The Government has no objection to the preservation of the handwritten notes taken by any of the Government's agents and officers. <u>See</u> <u>United States v. Harris</u>, 543 F.2d 1247, 1253 (9th Cir. 1976) (agents must preserve their original notes of interviews of an accused or prospective government witnesses). However, the Government objects to providing Defendant with a copy of any rough notes at this time. Rule 16(a)(1)(A) does not require disclosure of the rough notes where the content of those notes have been accurately reflected in a type-written report. <u>See</u> <u>United States v. Brown</u>, 303 F.3d 582, 590 (5th Cir. 2002); <u>United States v. Coe</u>, 220 F.3d 573, 583 (7th Cir. 2000) (Rule 16(a)(1)(A) does not require disclosure of an agent's notes even where

there are "minor discrepancies" between the notes and a report). The Government is not required to produce rough notes pursuant to the Jencks Act, because the notes do not constitute "statements" (as defined 18 U.S.C. § 3500(e)) unless the notes (1) comprise both a substantially verbatim narrative of a witness' assertion, and (2) have been approved or adopted by the witness. <u>United States v. Spencer</u>, 618 F.2d 605, 606-07 (9th Cir. 1980). The rough notes in this case do not constitute "statements" in accordance with the Jencks Act. <u>See</u> <u>United States v. Ramirez</u>, 954 F.2d 1035, 1038-39 (5th Cir. 1992) (rough notes were not statements under the Jencks Act where notes were scattered and all the information contained in the notes was available in other forms). The notes are not <u>Brady</u> material because the notes do not present any material exculpatory information, or any evidence favorable to Defendant that is material to guilt or punishment. <u>Brown</u>, 303 F.3d at 595-96 (rough notes were not <u>Brady</u> material because the notes were neither favorable to the defense nor material to defendant's guilt or punishment); <u>United States v. Ramos</u>, 27 F.3d 65, 71 (3d Cir. 1994) (mere speculation that agents' rough notes contained <u>Brady</u> evidence was insufficient). If, during a future evidentiary hearing, certain rough notes become discoverable under Rule 16, the Jencks Act, or <u>Brady</u>, the notes in question will be provided to Defendant.

### (2)    **Defendant's Prior Record**

The United States has provided Defendant with a copy of his criminal record in accordance with Federal Rule of Criminal Procedure 16(a)(1)(B).

### (3)    **Arrest Reports, Notes, and Dispatch Tapes**

The United States has provided the Defendant with arrest reports. As noted previously, agent rough notes, if any exist, will be preserved, but they will not be produced as part of Rule 16 discovery. At this time, the United States is unaware of any dispatch tapes regarding Defendant's apprehension.

### (4)    **Documents and Tangible Objects**

The Government has complied and will continue to comply with Rule 16(a)(1)(E) in allowing Defendant an opportunity, upon reasonable notice, to examine, inspect, and copy all documents and tangible objects seized that is within its possession, custody, or control, and that is either material to the preparation of Defendant's defense, or is intended for use by the

1     Government as evidence during its case-in-chief at trial, or was obtained from or belongs to

2     Defendant. The Government need not, however, produce rebuttal evidence in advance of trial.

3     United States v. Givens, 767 F.2d 574, 584 (9th Cir. 1984).

4     **(5)**     **Reports of Scientific Tests or Examinations**

5     Defendant requests written reports of tests pursuant to Federal Rules of Criminal Procedure

6     16(f). The United States will disclose to Defendant the name, qualifications, and a written

7     summary of testimony of any expert the United States intends to use during its case-in-chief at trial

8     pursuant to Fed. R. Evid. 702, 703, or 705.

9     **(6)**     **Expert Witnesses**

10     The Government will comply with Rule 16(a)(1)(G) and provide Defendant with a written

11     summary of any expert testimony that the Government intends to use under Rules 702, 703, or 705

12     of the Federal Rules of Evidence during its case-in-chief at trial. This summary shall include the

13     expert witnesses' qualifications, the expert witnesses opinions, the bases, and reasons for those

14     opinions.

15     **(7)**     **Brady Material**

16     The United States is well aware of and will continue to perform its duty under Brady v.

17     Maryland, 373 U.S. 83 (1963), and United States v. Agurs, 427 U.S. 97 (1976), to disclose

18     exculpatory evidence within its possession that is material to the issue of guilt or punishment.

19     Defendant, however, is not entitled to all evidence known or believed to exist which is, or may be,

20     favorable to the accused, or which pertains to the credibility of the United States' case. As stated

21     in United States v. Gardner, 611 F.2d 770 (9th Cir. 1980), it must be noted that "the prosecution

22     does not have a constitutional duty to disclose every bit of information that might affect the jury's

23     decision; it need only disclose information favorable to the defense that meets the appropriate

24     standard of materiality." Id. at 774-75 (citation omitted).

25     The United States will turn over evidence within its possession which could be used to

26     properly impeach a witness who has been called to testify.

27     Although the United States will provide conviction records, if any, which could be used

28     to impeach a witness, the United States is under no obligation to turn over the criminal records of

all witnesses. <u>United States v. Taylor</u>, 542 F.2d 1023, 1026 (8th Cir. 1976). When disclosing such information, disclosure need only extend to witnesses the United States intends to call in its case-in-chief. <u>United States v. Gering</u>, 716 F.2d 615, 621 (9th Cir. 1983); <u>United States v. Angelini</u>, 607 F.2d 1305, 1309 (9th Cir. 1979).

Finally, the United States will continue to comply with its obligations pursuant to <u>United States v. Henthorn</u>, 931 F.2d 29 (9th Cir. 1991).

### (8)     Preservation of Evidence

The United States will preserve all evidence to which Defendant is entitled pursuant to the relevant discovery rules. However, the United States objects to any blanket request to preserve all physical evidence.

The United States has complied and will continue to comply with Rule 16(a)(1)(C) in allowing Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical evidence which is within his possession, custody or control of the United States, and which is material to the preparation of Defendant's defense or are intended for use by the United States as evidence in chief at trial, or were obtained from or belong to Defendant, including photographs. The United States has made the evidence available to Defendant and Defendant's investigators and will comply with any request for inspection.

### (9)     Proposed 404(b)

Should the United States seek to introduce any similar act evidence pursuant to Federal Rule of Evidence 404(b), or prior convictions pursuant to Rule 609, the United States will provide Defendant with official notice of its proposed use of such evidence and information about such bad acts or prior convictions at the time the United States' trial memorandum is filed.

In an abundance of caution, the United States hereby notices Defendant that it intends to introduce evidence of his: (1) October 26, 2006 apprehension for alien smuggling where in Defendant was the driver of a vehicle with two illegal aliens concealed in the trunk.

### (10)     Witness Addresses

The Government has already provided Defendant with the reports containing the names of the agents involved in the apprehension and interviews of Defendant. A defendant in a non-capital

1  case, however, has no right to discover the identity of prospective Government witnesses prior to

2  trial.  See Weatherford v. Bursey, 429 U.S. 545, 559 (1977); United States v. Dishner, 974 F.2d

3  1502, 1522 (9th Cir 1992) (citing United States v. Steel, 759 F.2d 706, 709 (9th Cir. 1985)); United

4  States v. Hicks, 103 F.23d 837, 841 (9th Cir. 1996).   Nevertheless, in its trial memorandum, the

5  Government will provide Defendant with a list of all witnesses whom it intends to call in its case-

6  in-chief, although delivery of such a witness list is not required.  See United States v. Discher, 960

7  F.2d 870 (9th Cir. 1992); United States v. Mills, 810 F.2d 907, 910 (9th Cir. 1987).   The

8  Government is not aware of any "tips" provided by anonymous or identified persons that resulted

9  in Defendant's arrest.

10        The Government objects to any request that the Government provide a list of every witness

11  to the crimes charged who will not be called as a Government witness.  "There is no statutory basis

12  for granting such broad requests," and a request for the names and addresses of witnesses who will

13  not be called at trial "far exceed[s] the parameters of Rule 16(a)(1)(C)."  United States v. Hsin-

14  Yung, 97 F. Supp.2d 24, 36 (D. D.C. 2000) (quoting United States v. Boffa, 513 F. Supp. 444, 502

15  (D. Del. 1980)).  The Government is not required to produce all possible information and evidence

16  regarding any speculative defense claimed by Defendant.  Wood v. Bartholomew, 516 U.S. 1, 6-8

17  (1995) (per curiam) (holding that inadmissible materials that are not likely to lead to the discovery

18  of admissible exculpatory evidence are not subject to disclosure under Brady).

19        **(11)    Jencks Act Material**

20        The Jencks Act, 18 U.S.C. § 3500, requires that, after a Government witness has testified

21  on direct examination, the Government must give the Defendant any "statement" (as defined by

22  the Jencks Act) in the Government's possession that was made by the witness relating to the

23  subject matter to which the witness testified. 18 U.S.C. § 3500(b). A "statement" under the Jencks

24  Act is (1) a written statement made by the witness and signed or otherwise adopted or approved

25  by him, (2) a substantially verbatim, contemporaneously recorded transcription of the witness's

26  oral statement, or (3) a statement by the witness before a grand jury. 18 U.S.C. § 3500(e).  If notes

27  are read back to a witness to see whether or not the government agent correctly understood what

28  the witness was saying, that act constitutes "adoption by the witness" for purposes of the Jencks

1   Act. United States v. Boshell, 952 F.2d 1101, 1105 (9th Cir. 1991) (citing Goldberg v. United

2   States, 425 U.S. 94, 98 (1976)).  While the Government is only required to produce all Jencks Act

3   material after the witness testifies, the Government plans to provide most (if not all) Jencks Act

4   material well in advance of trial to avoid any needless delays.

5           **(11a)   Original I-213s**

6           Defendant's request for "Original I-213s" is nothing more than a baseless ploy to obtain

7   draft reports.  The United States has produced all final investigative reports to Defendant.  Notably,

8   Defendant has provided no basis in law for this request.  Again, the United States is well aware of

9   and will continue to perform its duty under Brady v. Maryland, 373 U.S. 83 (1963), and United

10  States v. Agurs, 427 U.S. 97 (1976), to disclose exculpatory evidence within its possession that is

11  material to the issue of guilt or punishment.

12          **(12)    Informants and Cooperating Witnesses**

13          At this time, the Government is not aware of any confidential informants or cooperating

14  witnesses involved in this case.   The Government must generally disclose the identity of

15  informants where (1) the informant is a material witness, or (2) the informant's testimony is crucial

16  to the defense.  Roviaro v. United States, 353 U.S. 53, 59 (1957).  If there is a confidential

17  informant involved in this case, the Court may, in some circumstances, be required to conduct an

18  in-chambers inspection to determine whether disclosure of the informant's identity is required

19  under Roviaro.  See United States v. Ramirez-Rangel, 103 F.3d 1501, 1508 (9th Cir. 1997).  If the

20  Government determines that there is a confidential informant somehow involved in this case, the

21  Government will either disclose the identity of the informant or submit the informant's identity to

22  the Court for an in-chambers inspection.

23          **(13)    Residual Request**

24          The Government has already complied with Defendant's request for prompt compliance

25  with its discovery obligations.  The Government will comply with all of its discovery obligations,

26  but objects to the broad and unspecified nature of Defendant's residual discovery request.

27  //

28  //

1    **B.    <u>MOTION TO PRESERVE EVIDENCE</u>**

2    The United States will preserve all evidence to which Defendant is entitled pursuant to the

3    relevant discovery rules.  However, the United States objects to Defendant's blanket request to

4    preserve all physical evidence.

5    The United States has complied and will continue to comply with Rule 16(a)(1)(C) in

6    allowing Defendant an opportunity, upon reasonable notice, to examine, copy and inspect physical

7    evidence which is within his possession, custody or control of the United States, and which is

8    material to the preparation of Defendant's defense or are intended for use by the United States as

9    evidence in chief at trial, or were obtained from or belong to Defendant, including photographs.

10   The United States has made the evidence available to Defendant and Defendant's investigators and

11   will comply with any request for inspection.

12   **C.    DEFENDANT'S MOTION TO DISMISS THE INDICTMENT DUE TO
         <u>MISINSTRUCTION TO THE GRAND JURY SHOULD BE DENIED</u>**

13
14       Defendant has filed a lengthy attack upon Judge Larry A. Burns' instructions to the Grand

     Jury that was empaneled on January 11, 2007.  Government counsel is aware of at least two other
15
     cases in which this Court has issued a written order denying this same motion. [<u>See</u> Judge John A.
16
     Houston Orders, Attachments A and B.]  Notably, every court in this District that has addressed
17
     the issues raised in this motion have denied this motion as meritless.  [<u>See, e.g.</u>, Judge Barry T.
18
     Moskowitz Order, Attachment C.]  For the reasons stated in this Court's prior orders, this Court
19
     should also deny Defendant's motion.
20
21   **D.    DEFENDANT'S MOTION TO PRODUCE GRAND JURY TRANSCRIPTS
         <u>SHOULD BE DENIED</u>**

22       Defendant essentially argues that all Defendant's indicted by the January 2007 grand jury

23   are entitled to review the grand jury transcripts in their case.  What Defendant is really requesting

24   is for this Court to ignore long-standing precedent that requires a defendant to  meet the threshold

25   showing of a "particularized need"that outweighs the policy of grand jury secrecy.  <u>United</u>

26   <u>States v. Walczak</u>, 783 F.2d 852, 857 (9th Cir. 1986); <u>United States v. Murray</u>, 751 F.2d 1528,

27   1533 (9th Cir. 1985).  Defendant has failed to demonstrate any particularized need.  First, in the

28

1    context of this case, whether material witness Nava-Montenegro ever got into Defendant's vehicle

2    is much ado about nothing, since Defendant has also been charged as an aider and abettor.

3    Defendant's argument that the Ninth Circuit's en banc decision in Lopez precludes charging

4    Defendant with aiding in the smuggling of Nava-Montenegro is misplaced.  The Lopez Court

5    specifically noted that "under certain circumstances a defendant who does not physically transport

6    aliens across the border may be held criminally liable for aiding and abetting a 'brings to' offense."

7    United States v. Lopez, 484 F.3d 1186, 1191 (9th Cir. 2007).  The Court refused to determined

8    "precisely what actions may or may not render a defendant guilty of aiding and abetting."  Id. at

9    1199.  Yet, in a subsequent case, the Court stated that "[a material witness's] testimony that he

10   intended to pay somebody to be brought into the United States and that he accompanied a group

11   of ten people across the border, is sufficient for a trier of fact to find beyond a reasonable doubt

12   that he was brought into the United States in violation of 8 U.S.C. § 1324(a)(2)(B)(ii) by the

13   smugglers with which [the defendant] cooperated."  United States v. Whittington, 241 Fed. Appx.

14   388, 390 (9th Cir. 2007).   Here, there is evidence to suggest that Defendant was aiding and

15   abetting even before the aliens crossed the border – that is, his vehicle crossed from Mexico into

16   the United States at the Tecate, California Port of Entry that same morning.  Additionally, material

17   witness Nava-Montenegro admitted to coming across the border with a large group of people, most

18   who got into Defendant's vehicle.   That Nava-Montenegro, at the last second, was told that he

19   would be getting into a different vehicle (likely because the speaker box was already to full

20   capacity with 5 people) does not change the fact that Defendant was aiding and abetting in the

21   bringing in and transportation of everyone in the group.

22        Defendant also contends that the grand jury transcript must be produced since no material

23   witness could identify Defendant as the driver until they were all apprehended and therefore the

24   United States can not prove knowledge and intent.  This argument, simply put, is nonsensical.

25   Numerous Border Patrol Agents observed Defendant driving the Nissan Pathfinder.  Five illegal

26   aliens were found stuffed in a speaker box, some who stated that they were in pain and/or had

27   trouble breathing.  Any fact-finder could and would reasonably infer that Defendant must have

28

1    known about the aliens–otherwise he could have unknowingly driven for hours on end before

2    stopping–in which time grave harm could have befallen those individuals crammed into the

3    speaker box without any air.

4          Again, the discovery produced to Defendant provides enough evidence to sustain a

5    probable cause finding by the grand jury on each count in the indictment.  Defendant has failed to

6    articulate a particularized need sufficient to pierce the sanctity of the grand jury's proceedings in

7    this matter.  Therefore, this Court must deny Defendant's motion.

8    **E.      DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SHOULD BE DENIED**

9          **1.      Encounter with Defendant**

10         Defendant contends that, under the Fourth Amendment, this Court must suppress all

11   evidence because agents lacked probable cause to stop Defendant's vehicle, arrest Defendant, and

12   search Defendant's vehicle.  This motion is entirely without merit.

13         An officer may stop a motorist where he has a "particularized and objective basis for

14   suspecting the particular person stopped of criminal activity."  United States v. Cortez, 449 U.S.

15   411, 417-18 (1981).

16             "Reasonable suspicion" is less than probable cause, U.S. v. Brignoni-Ponce, 422
               U.S. at 880, 95 S.Ct. at 2579-80, and "the facts used to establish 'reasonable
17             suspicion' need not be inconsistent with innocence."  U.S. v. Franco-Munoz, 952
               F.2d 1055, 1057 (9th Cir. 1991).  However, a finding of reasonable suspicion must
18             be based upon "the degree of suspicion that attaches to particular types of non-
               criminal acts." U.S. v. Sokolow, 490 U.S. 1, 10, 109 S. Ct. 1581, 1587, 104 L.Ed.2d
19             1 (1989).

20   United States v. Rodriguez, 976 F.2d 592, 594 (9th Cir. 1992).

21
               An officer may make an investigatory stop if he is aware of specific, articulable
22             facts which, together with objective and reasonable inferences, form a basis for
               suspecting that the particular person detained is engaged in criminal activity.
23             United States v. Cortez, 449 U.S. 411, 416-18, 101 S.Ct. 690, 694-95, 66 L.Ed.2d
               621 (1981).  Such determination is not readily reduced to "a neat set of legal rules."
24             Illinois v. Gates, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983).
               The officer must consider the "totality of the circumstances - the whole picture."
25             United States v. Sokolow, 409 U.S. 1, 7, 109 S.Ct. 1581, 1585, 104 L.Ed.2d 1
               (1989)(quoting Cortez, 449 U.S. at 418, 101 S.Ct. at 695).
26
     United States v. Hernandez-Alvarado, 891 F.2d 1414, 1416 (9th Cir. 1989).  The Supreme Court
27
     in Sokolow also said:
28

The officer of course must be able to articulate something more than an "inchoate and unparticularized suspicion or hunch." (citations omitted). The Fourth Amendment requires "some minimal level of objective justification" for making the stop. (citations omitted). That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence. We have held that probable cause means a "fair probability that contraband or evidence of a crime will be found." Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332, 76 L.E.2d 527 (1983), and the level of suspicion required for a Terry stop is obviously less demanding than that for probable cause. See United States v. Montoya de Hernandez, 473 U.S. 531, 105 S. Ct. 3304, 3312, 87 L.Ed.2d 381 (1985).

United States v. Sokolow, 490 U.S. 1, 7 (1989).

The Supreme Court and Ninth Circuit have repeatedly applied these principles to hold that officers had reasonable suspicion to stop vehicles in border areas. See, e.g., United States v. Arvizu, 534 U.S. 266 (2002) (reasonable suspicion based upon inferences and experience to stop vehicle in remote border area); Cortez, 449 U.S. at 418-22 (reasonable suspicion to stop car near border based upon intricate series of deductions); United States v. Ordaz, 145 F.3d 1111, 1112 (9th Cir. 1998) (reasonable suspicion to stop four out of six cars emerging from border area where surveillance had detected possible drug activity); United States v. Avalos-Ochoa, 557 F.2d 1299, 1301-02 (9th Cir. 1977) (reasonable suspicion based, in part, on sensor alert more than three hours old; rejecting argument it was stale). These cases compel the conclusion that there is reasonable suspicion in this case.

The facts and analysis in Cortez, 449 U.S. 411, are particularly relevant. In Cortez, Border Patrol officers working in a remote desert area identified a distinctive set of footprints that they believed--based upon studying the characteristics of the prints and their experience in that area--belonged to an alien smuggler. 449 U.S. at 413. Based upon the location and frequency of the tracks, the weather patterns, their geographical knowledge of the area and a complicated, yet logical, series of inferences and deductions, the officers concluded that the smuggler would arrive at Highway 86 somewhere between 2 a.m. and 6 a.m. on January 31. Id. at 414. The officers went to the predicted location and saw 20 vehicles pass within a five hour period. Two were pickup trucks with camper shells which matched the officers' idea of the type of truck which might be used. The officers saw one truck pass one way down the road and then return one and one-half hours later. The officers stopped the truck and found the suspected smuggler in the passenger seat.

1    Id. at 415.  The officers asked the driver if he had any passengers in the back.  The driver opened

2    up the back of the camper and the officers found six illegal aliens.  Id. at 416.

3        The Ninth Circuit held that the officers lacked reasonable suspicion to single out the

4    particular truck and that the officers' suspicions depended on "far too many innocent inferences."

5    Id. at 416-17.  The Supreme Court reversed.  The Court began by noting that reasonable suspicion

6    "does not deal with hard certainties, but with probabilities" and "certain commonsense conclusions

7    about human behavior" and that the evidence "must be seen and weighed not in terms of library

8    analysis by scholars, but as understood by those versed in the field of law enforcement."  Id. at 418.

9    The Court recognized the "enormous difficulties of patrolling a 2,000-mile open border and the

10   patient skills needed by those charged with halting illegal entry into this country."  Id. at 418-19.

11   The Court emphasized the "imperative" of recognizing the expertise of law enforcement officers

12   because "objective facts, meaningless to the untrained, can be combined with permissible

13   deductions from such facts to form a legitimate basis for suspicion of a particular person and for

14   action on that suspicion."  Id. at 419.  The Court commended the investigation as "the kind of

15   police work often suggested by judges and scholars as examples of appropriate and reasonable

16   means of law enforcement . . . fact on fact and clue on clue afforded a basis for the deductions and

17   inferences that brought the officers to focus on [the defendant.]"  Id.  After considering the

18   investigative steps, the Court held the officers "could reasonably surmise that the particular vehicle

19   they stopped was engaged in criminal activity."  Id. at 419-22.

20       In the instant case, the agents were performing surveillance of a parking lot, just north of

21   the international border, that is known as a stationing area for alien smuggling.  Agents observed

22   Defendant open the door to his vehicle as two individuals approached the car.  It appeared to the

23   observing agents that the two individuals were going to enter the vehicle, but before doing so,

24   turned around.  At that point, Defendant got back into the vehicle and drove away.  As agents

25   approached the two individuals in order to question them, the individuals began to run back toward

26   Mexico; one person made it back to Mexico, the other – Nava-Montenegro–was detained.  Nava-

27   Montenegro admitted that he was an illegal alien without any lawful right to enter the United

28   States.  After agents observed Nava-Montenegro's interaction with Defendant, along with Nava-

1  Montenegro admission that he was illegally in the United States, reasonable suspicion existed to

2  believe that Defendant was presently engaged in alien smuggling.    The totality of the

3  circumstances supported stopping Defendant for questioning.

4      After Defendant was lawfully stopped, the agents on the scene questioned Defendant as to

5  his citizenship.  During the course of this Terry stop, agents could hear people moving around in

6  a speaker box in the back of the SUV.    At this point, probable cause existed to believe that

7  Defendant was engaged in alien smuggling.  The speaker box was lawfully searched under the

8  vehicle exception to the warrant requirement.  Additionally, exigent circumstances supported the

9  search as the agents could hear people inside the speaker box, and they would be remiss in their

10  duties if they did not immediately extricate these individuals from the compartment.

11      The agents did everything right in this case to ensure that probable cause existed for the

12  stop, search, and arrest.  Not only did probable cause exist, but the agents actions likely averted

13  substantial harm to those aliens crammed into a speaker box that had no air.

14  **F.    DEFENDANT'S MOTION TO DISMISS THE INDICTMENT DUE TO THE
15      ALLEGED DEPORTATION OF EXCULPATORY WITNESSES SHOULD BE
      DENIED**

16      Defendant's contention that exculpatory witnesses were deported back to Mexico is a

17  blatant misrepresentation of the facts in this case.  As a threshold matter, Defendant was informed

18  of his right to retain witnesses favorable to his defense.  He declined to waive the release of any

19  witnesses, however he also refused to indicate which witnesses he wished to retain without the

20  advice of counsel.  It is well settled that Defendant has no right to counsel for making this

21  determination.  See United States v. Lujan Castro, 602 F.2d 877 (9th Cir. 1979); Derrick v.

22  Peterson, 924 F.2d 813, 824 (9th Cir. 1990).

23      In the face of Defendant's refusal to either waive his Lujan-Castro right or specify which

24  aliens he wished to retain, the Border Patrol elected to voluntarily return Laura Lopez-Alfaro and

25  her two juvenile children (ages 11 and 13) back to Mexico.  The removal of these three witnesses

26  in no way violated Defendant's due process rights under the Fifth or Sixth Amendments.

27      The Ninth Circuit has delineated a two-part test to determine whether a defendant's rights

28  have been violated in this context.  First, Defendant "must make an initial showing that the

1   Government acted in bad faith.  See United States v. Dring, 930 F.2d 687, 693 (9th Cir. 1991).

2   Second, Defendant must show that this conduct resulted in prejudice to his case.  Id.  The prevail

3   under the prejudice prong, Defendant must at least make "'a plausible showing that the testimony

4   of the deported witnesses would have been material and favorable to his defense, in ways not

5   merely cumulative to the testimony of available witnesses.'"  Id. (citing United States v.

6   Valenzuela-Bernal, 458 U.S. 858, 873 (1982).  Defendant's argument that his rights were violated

7   fail on both prongs.

8       First, Defendant simply can not demonstrate bad faith.  He argues that "the government

9   failed to interview the alien witnesses regarding what if any information they had regarding the

10  allegations against Mr. Hayes and specifically, what information they had about the stop of the

11  vehicle Mr. Hayes was driving."  [Def. Mot. 33.]  This is simply not true.  Laura Lopez-Alfaro

12  gave a sworn statement and was asked the same questions as all the witnesses that were kept.  This

13  statement was produced to Defendant in discovery.  Ms. Lopez-Alfaro was allowed to return to

14  Mexico because her statement was in no way materially different than the other witnesses, and she

15  was with her two children.  This situation is a far cry from bad faith.

16      Second, Defendant can not demonstrate any prejudice whatsoever.  Again, Ms. Lopez-

17  Alfaro gave a sworn statement that was merely cumulative of statements made by retained material

18  witnesses.  Any argument that she was an exculpatory witnesses is completely speculative.  Thus,

19  Defendant has failed to make a plausible showing that his rights were violated.

20  **G.    DEFENDANTS MOTION TO SUPPRESS THE STATEMENTS OF WITNESSES VOLUNTARILY RETURNED TO MEXICO IS UNOPPOSED**

21

22      Interestingly, Defendant requests that this Court suppress all statements made by witnesses

23  that were voluntarily returned to Mexico, yet he earlier argues that these witnesses are exculpatory

24  in nature.  In any event, the United States does not opposed Defendant's motion.

25  **H.    DEFENDANT'S MOTION TO SEVER COUNTS 1, 3 AND 5 FROM COUNTS 2, 4, AND 6 SHOULD BE DENIED**

26      Defendant argues that joinder of the "bringing in" counts (counts 1, 3, and 5) and the

27  "transportation" counts (counts 2, 4, and 6) is inappropriate since it will prevent him from

28

exercising either his constitutional right against self incrimination or his right to testify on his own behalf.  [Def. Mot 36.]  This motion approaches the frivolous.

Defendant was smuggling aliens for financial gain and was transporting those same aliens, whether directly or as an aider and abettor.  As such, the "bringing in" counts are inextricably intertwined with the "transportation" counts and have overlapping proof requirements. Additionally, all counts involve the same vehicle, on the same date, during the same period of time, under the exact same circumstances, as witnessed by the exact same people  who wrote the exact same reports that will be fodder for cross-examination.  Of course there are circumstances where severance is appropriate and even necessary to preserve the rights of the accused. As will be demonstrated by the following discussion of the Ninth Circuit case law, the instant case does not present the facts that weigh toward severance.

As a threshold matter, joinder is appropriate under the Federal Rules. All six counts implicate the exact same facts.  Federal Rule of Criminal Procedure 8 specifically provides for the joinder of counts where they:

> are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Fed.R.Crim.P. 8(a) (emphasis added).  This Rule phrases these connectivity requirements in the disjunctive. This disjunctive phrasing means that any of the three circumstances described therein would suffice to make joinder appropriate under Rule 8(a). Here, all counts are of the same or similar character and are based on the same act.

The granting or denial of a motion for severance is governed by Federal Rule of Criminal Procedure 14.  Rule 14 provides in pertinent part:

> If it appears that a defendant or the Government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court many order an election or separate trials of counts grant a severance of defendants or provide whatever other relief justice requires.

Fed.R.Crim.P. 14.  In other words, Rule 14 provides that counts may be severed when it is apparent that a joint trial would cause impermissible prejudice. The Court's inquiry should therefore be confined to whether joinder causes impermissible prejudice to Defendant. The burden of demonstrating impermissible prejudice, rests with Defendant. See United States v.

1    *Vasquez-Velasco*, 15 F.3d 833, 844 (9th Cir.1994). Even without that burden, as demonstrated

2    *infra*, the case law indicates that such impermissible prejudice does not exist under the instant

3    facts.

4    Defendant first relies upon *Cross v. United States*, 335 F.2d 987 (1964), for the proposition

5    that he is prejudiced because he wishes to testify about the transportation charges, but not the

6    bringing in charges. Notably, Defendant recites but analytically ignores the following baseline

7    proposition: "Prejudice may develop when an accused wishes to testify on one but not the other

8    of two joined offenses which are clearly distinct in time, place and evidence." *Cross*, 335 F.2d at

9    989. In that case, the defendant was charged with the commission of two distinct robberies that

10   occurred several months apart and had no connection to each other. *Id.* at 988. The present

11   situation is the polar opposite – all counts relate to the same date, witnesses, and acts.

12   Defendant next relies upon a string of cases that suggest that prejudice may exist where

13   there is much more evidence of guilt in one charge than there is to another. Even a cursory review

14   of Defendant's argument reveals that he is trying to shove a square peg into a round hole. In *Bean

15   v. Calderon*, the Ninth Circuit faced a case where one murder trial that involved a mountain of

16   forensic and other evidence was paired with another murder trial where the sole evidence was a

17   fingerprint found at the scene. 163 F.3d 1073, 1085 (9th Cir. 1998). This disparity of evidence,

18   combined with facially sufficient jury instructions, resulted in actual prejudice. *Id.* However, the

19   Ninth Circuit took pains to emphasize that joinder was inappropriate as a threshold matter, which

20   contributed to the prejudice. *Id.* at 1086 ("the only rationale the State could muster in support of

21   joinder was that it was more convenient for the prosecution to try the disparate cases together").

22   In the instant case, there is neither the same disparity in evidence - the evidence is almost identical

23   in both cases - or the threshold misjoinder. The Defendant states that the evidence in the

24   transportation counts is stronger (albeit insufficient to sustain a conviction) than the evidence in

25   the bringing in counts. His contention is premised on a faulty understanding of *Lopez* and the

26   proof needed to sustain a conviction.

27

28

1    **I.     THE UNITED STATES DOES NOT OPPOSE LEAVE TO FILE FURTHER**
     **MOTIONS, SO LONG AS THEY ARE BASED ON NEW EVIDENCE**

2

3          The United States does not object to the granting of leave to file further motions as long

4    as the order applies equally to both parties and any additional defense motions are based on

5    newly discovered evidence or discovery provided by the Government subsequent to the instant

6    motion.

7                                        **IV**

8                    **GOVERNMENT'S MOTION FOR RECIPROCAL DISCOVERY**

9    **A.     ALL EVIDENCE FOR DEFENDANT'S CASE-IN-CHIEF**

10         Since the Government will honor Defendant's request for disclosure under Rule

11   16(a)(1)(E), the Government is entitled to reciprocal discovery under Rule 16(b)(1).  Pursuant

12   to Rule 16(b)(1), the United States requests that Defendant permit the Government to inspect,

13   copy and photograph any and all books, papers, documents, photographs, tangible objects, or

14   make copies or portions thereof, which are within the possession, custody, or control of

15   Defendant and which Defendant intends to introduce as evidence in his case-in-chief at trial.

16         The Government further requests that it be permitted to inspect and copy or photograph

17   any results or reports of physical or mental examinations and of scientific tests or experiments

18   made in connection with this case, which are in the possession and control of Defendant, which

19   he intends to introduce as evidence-in-chief at the trial, or which were prepared by a witness

20   whom Defendant intends to call as a witness.  The Government also requests that the Court

21   make such order as it deems necessary under Rules 16(d)(1) and (2) to ensure that the

22   Government receives the reciprocal discovery to which it is entitled.

23   **B.     RECIPROCAL JENCKS – STATEMENTS BY DEFENSE WITNESSES**

24         Rule 26.2 provides for the reciprocal production of Jencks material. Rule 26.2 requires

25   production of the prior statements of all witnesses, except a statement made by Defendant.

26   The time frame established by Rule 26.2 requires the statements to be provided to the

27   Government after the witness has testified.  However, to expedite trial proceedings, the

28   Government hereby requests that Defendant be ordered to provide all prior statements of

defense witnesses by a reasonable date before trial to be set by the Court.  Such an order should include any form in which these statements are memorialized, including but not limited to, tape recordings, handwritten or typed notes and reports.

<div align="center">

**V**

**CONCLUSION**

</div>

For the foregoing reasons, the United States requests that the Court deny Defendant's motions, except where unopposed, and grant the United States' motions for reciprocal discovery and fingerprint exemplars.

DATED: March 21, 2008

<div style="margin-left: 50%">

Respectfully submitted,

KAREN P. HEWITT
United States Attorney

/s/ *Eugene S. Litvinoff*
_____
EUGENE S. LITVINOFF
Assistant United States Attorney
Attorneys for Plaintiff
United States of America
Email: Eugene.Litvinoff2@usdoj.gov

</div>

1

2                          UNITED STATES DISTRICT COURT

3                        SOUTHERN DISTRICT OF CALIFORNIA

4

5    UNITED STATES OF AMERICA,        )              Case No. 08CR0366-DMS
                                      )
6                    Plaintiff,       )
                                      )
7            v.                       )
                                      )              CERTIFICATE OF SERVICE
8    JAMES HAYNES III,                )
                                      )
9                    Defendant.       )
                                      )
10  ─────────────────────────────────

11  IT IS HEREBY CERTIFIED THAT:

12          I, EUGENE S. LITVINOFF, am a citizen of the United States and am at least eighteen

     years of age.  My business address is 880 Front Street, Room 6293, San Diego, California
13
     92101-8893.
14
            I have caused service of **GOVERNMENT'S RESPONSE IN OPPOSITION TO**
15
     **DEFENDANTS' MOTIONS and GOVERNMENT'S MOTION FOR RECIPROCAL**
16
     **DISCOVERY** on the following parties by electronically filing the foregoing with the Clerk of
17
     the District Court using its ECF System, which electronically notifies them.
18
            1.      **David M.C. Peterson, Esq.**
19
            I hereby certify that I have caused to be mailed the foregoing, by the United States
20
     Postal Service, to the following non-ECF participants on this case:
21
            N/A
22
     the last known address, at which place there is delivery service of mail from the United States
23
     Postal Service.
24
            I declare under penalty of perjury that the foregoing is true and correct.
25
            Executed on March 21, 2008.
26
                                              /s/ *Eugene S. Litvinoff*
27                                            ─────────────────────────────
                                              EUGENE S. LITVINOFF
28                                            Assistant U.S. Attorney

     Government's Response – Haynes III              24                      08CR0366-DMS